**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JOHNSON & JOHNSON VISION
CARE, INC.,

        Plaintiff,

vs.

        Case No. 3:03-cv-800-J-99TEM
        Case No. 3:04-cv-1297-J-32TEM
        Case No. 3:05-cv-135-J-32TEM

CIBA VISION CORPORATION,

        Defendant.

## ORDER

Plaintiff Johnson & Johnson Vision Care, Inc. ("J&J"), and defendant CIBA Vision Corporation ("CIBA") compete in the sale of ophthalmic goods. J&J brings these cases, now consolidated, under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaration of non-infringement, invalidity, and unenforceability with respect to five CIBA patents, specifically, U.S. Patent Nos. 5,760,100 ("'100 patent"), 5,776,999 ("'999 patent"), 5,789,461 ("'461 patent"), 5,849,811 ("'811 patent"), and 5,965,631 ("'631 patent")(collectively, "Nicolson patents"), that cover technology used in the development of soft contact lenses. CIBA now moves for a preliminary injunction[1] to stop J&J's imminent

---

[1] CIBA styled its motion as one for a temporary restraining order ("TRO") so that the Court would decide it posthaste. Since CIBA provided J&J with notice, the

domestic launch of the sale of new contact lenses that allegedly infringe claim 25 of the '811 patent and claim 1 of the '631 patent.  The Court held an evidentiary hearing on August 9, 2005, at which the parties presented arguments, declarations, deposition transcripts,[2] demonstrative exhibits, other documents, and live testimony.  It is on this record that the Court decides whether a preliminary injunction is warranted.[3]

**I.      Facts**

The contact lens industry is a large and competitive one.  The 1980s and 1990s saw competition among contact lens manufacturers to be the first to develop a contact lens that could be worn safely and effectively for 30 continuous days.  Previous such endeavors had met with safety problems and eventual disapproval from the U.S. Food & Drug Administration ("FDA"), but patient demand for convenience and uninterrupted clear vision nevertheless remained.

---

Court ordered that the motion for a TRO be treated as a motion for a preliminary injunction.

[2]      The Court allowed each party to take up to two depositions to prepare for the preliminary injunction hearing.  In addition to these depositions, the parties offered excerpts from depositions taken in the first filed case (no. 3:03-cv-800-J-99TEM).

[3]      The motion for a preliminary injunction and related exhibits were filed in case no. 3:05-cv-135-J-32TEM before it was consolidated with case nos. 3:03-cv-800-J-99TEM and 3:04-cv-1297-J-32TEM.  Unless otherwise indicated, all references to docket entries in this Order refer to docket entries in case no. 3:05-cv-135-J-32TEM.

2

CIBA was one of the manufacturers that recognized the commercial potential at hand. In 1992, CIBA assembled an international team of scientists led by Paul C. Nicolson, Ph.D, to work on what it coined the "SEE3" program. Out of the SEE3 program arose contact lenses that CIBA says "revolutionized the contact lens industry" by combining the breathability of silicone with the comfort of hydrogel[4] to make "the world's first true extended wear lenses." (CIBA App. at t. 1 ¶ 2.) CIBA released the lenses in 1998 under its Focus® NIGHT & DAY™ name. According to CIBA, they since have enjoyed "outstanding commercial success ... and have received numerous accolades from the eye care community." (Id. at ¶ 4.) Until recently, Focus® NIGHT & DAY™ lenses were the only 30-day extended wear lenses on the domestic market.

CIBA says it has spent more than $150 million developing and testing its extended wear lens technology. To exclude competitors from capitalizing on its investment, CIBA sought and obtained seven U.S. patents that include both device and method patents, along with divisionals and continuations thereof. The five Nicolson patents at issue in these consolidated cases are among the seven.

Given the competition in the industry, it is not surprising that there have

---

[4]    Hydrogel is a synthetic polymeric material. According to Dr. Nicolson, hydrogel contact lenses first became available in 1970 and were "very well accepted because of their comfort, in strong contrast to rigid lenses." (J&J App. at t. 25 ¶ 8.)

been many challenges to the Nicolson patents.  One such challenge was between CIBA and Bausch & Lomb, Inc. ("B&L"), in the United States District Court for the Northern District of Georgia ("B&L case").  There, CIBA alleged that B&L's 30-day extended wear lenses marketed under the PureVision™ name infringed the '100, '999, '461, and '811 patents.[5]  The B&L case proceeded to a lengthy trial but the parties settled before final judgment.  As part of the settlement, CIBA granted B&L a non-exclusive license to the Nicolson patents under which B&L could sell its PureVision™ lenses.  For its part, B&L agreed to temporarily stay off the market, pay CIBA a royalty on the eventual sales of PureVision™ lenses, and give CIBA a royalty-free cross-license to B&L's silicone hydrogel patents.  The settlement agreement was signed in July 2004 and the B&L case was dismissed.

While the B&L case was pending, CIBA and J&J were involved in their own negotiations.  Though initially reluctant to license the Nicolson patents to J&J, CIBA ultimately offered such a license at a 15% royalty rate.  J&J rejected this offer as exorbitant and economically unfeasible.  The parties later exchanged some correspondence about the Nicolson patents, but J&J ultimately decided to seek declaratory relief in the form of these consolidated cases.[6]

---

[5]   The '631 patent that is the fifth Nicolson patent at issue here was not part of the B&L case because it was issued after the B&L case was filed.

[6]   Additional details about the negotiations can be found in this Court's order denying CIBA's motion to dismiss case nos. 3:04-cv-1297-J-32TEM and 3:05-cv-

J&J filed the first case (3:03-cv-800-J-32TEM) in September 2003 seeking a declaration that its daily wear silicone hydrogel contact lenses marketed under the ACUVUE® ADVANCE™ with Hydraclear™ name, then expected to be launched in January 2004, do not infringe the Nicolson patents.  J&J filed the second case (3:04-cv-1297-J-32TEM) in December 2004 seeking the same declaration with respect to its similar lenses, though toric shaped to correct for astigmatism.  J&J filed the third case (3:05-cv-135-J-32TEM) in February 2005 seeking the same declaration with respect to its newest silicone hydrogel contact lenses, expected to be released on the market on August 22, 2005, as daily wear lenses under the ACUVUE® OASYS™ name.  CIBA separately responded to all three cases by moving to dismiss for lack of an actual controversy between the parties.  CIBA did not move for a TRO or a preliminary injunction in the first and second cases.  It did so in the third case four months after it was filed but before its motion to dismiss was decided.[7]  The motion for preliminary injunction asks the Court to enjoin J&J from marketing and selling its ACUVUE® OASYS™ lenses pendente lite.

According to J&J, its ACUVUE® OASYS™ lenses "arose from years of painstaking research and development involving dozens of J&J's most prominent

---

135-J-32TEM.  (Doc. 33.)

[7]  The Court has now denied the motions to dismiss in all three cases.  (Doc. 40 in case no. 3:03-cv-800-32TEM; Doc. 23 in case no. 3:04-cv-1297-J-32TEM; and Doc. 33 in case no. 3:05-cv-135-J-32TEM.)

scientists and engineers." (Doc. 34 at p. 22.) J&J says its new lenses are not like the "older" silicone hydrogel lenses sold by CIBA and B&L because their surfaces do not need to be treated. (Id.) J&J began manufacturing its ACUVUE® OASYS™ lenses in late 2004, launched them in Europe in March 2004, and now is preparing for their imminent U.S. market release date.[8]

J&J says it has spent $14 million on its marketing efforts to uniquely position the ACUVUE® OASYS™ lenses as the solution to "dry and tired" eyes resulting from wearing contact lenses in challenging environments. Peter Valenti, J&J Vice President, Marketing – U.S., testified that although there are several hundred types of soft contact lenses available on the market today, many of which are made from hydrogel or silicone hydrogel, none have been positioned in the same or a similar way.

The FDA so far has approved ACUVUE® OASYS™ lenses for daily use only, so they initially will be marketed and sold as such. The FDA may also approve them for 7-day extended wear use, but J&J is not forestalling the launch until such time. J&J states that it desires the 7-day extended wear approval less to

---

[8] J&J's domestic launch plan includes these dates: July 8, 2005 (introductory sales calls begin); July 8-18, 2005 (distributor sales personnel complete product training); August 8, 2005 (initial stock orders confirmed); August 15, 2005 (initial stock orders ship); and August 22, 2005 (market release). CIBA has asked the Court to decide its motion for preliminary injunction no later than the market release date of August 22, 2005.

position ACUVUE® OASYS™ lenses against the 40-50 other weekly soft contact lenses currently on the market and more to address practitioners' interest in safely prescribing daily wear lenses to patients who sometimes wear them overnight.

On the day CIBA filed its motion for preliminary injunction, CIBA believed that ACUVUE® OASYS™ lenses would be sold as 30-day extended wear lenses and thus compete directly with the only other two lenses of that modality currently on the domestic market: CIBA's own Focus® NIGHT & DAY™ lenses and B&L's PureVision™ lenses for which CIBA receives a royalty.  This belief was understandable because J&J is selling its ACUVUE® OASYS™ lenses in Europe as 30-day extended wear lenses and also had applied for FDA approval to do so in the U.S.  However, on same day that CIBA filed its motion for preliminary injunction, J&J informed the FDA that it no longer would seek 30-day extended wear approval and would amend its application to seek 7-day extended wear approval.[9]  At the hearing on the motion for preliminary injunction, J&J counsel represented to the Court that J&J would not be marketing or selling ACUVUE® OASYS™ lenses for 30-day extended wear use in the U.S. during the pendency of

---

[9]     J&J takes pains to show that it was serendipity that J&J informed the FDA of its plan on the same day that CIBA filed the motion for preliminary injunction and not a litigation stratagem to undermine CIBA's efforts.

7

these consolidated cases.[10]

This change in J&J's regulatory and marketing strategy necessitated a change in CIBA's preliminary injunction strategy which theretofore had been based on the anticipated competition between J&J's ACUVUE® OASYS™ lenses and CIBA's 30-day extended wear Focus® NIGHT & DAY™lenses.  In a deposition taken after the motion for preliminary injunction was filed but before J&J revealed its changed strategy, CIBA's designated representative testified that CIBA was seeking to keep the ACUVUE® OASYS™ lenses, but not the ACUVUE® ADVANCE™ lenses, off the market pendente lite because of CIBA's belief that the ACUVUE® OASYS™ lenses would directly compete with its Focus® NIGHT & DAY™lenses.

CIBA's arguments now focus on the effect that ACUVUE® OASYS™ lenses will have on CIBA's $O_2$OPTIX™ lenses.[11]  There is not much in the record about the $O_2$OPTIX™ lenses, except that they are approved for daily wear and up to 6-nights of extended wear use, and already compete with the ACUVUE® ADVANCE™ lenses.  In his hearing testimony, Mr. Valenti acknowledged that

---

[10]   The colloquy between the Court and J&J counsel on the subject of marketing of the ACUVUE® OASYS™ can be found in the rough transcripts at page 31, lines 19-24.

[11]   CIBA does not concede that there will not be competition between ACUVUE® OASYS™ and Focus® NIGHT & DAY™, pointing out that 16% of patients who wear the latter lenses do so on a daily wear basis.

8

there could be some competition between J&J's ACUVUE® OASYS™ and CIBA's O$_2$OPTIX™, but only to the extent that patients have choices among the many lenses available on the market.

## II.     Discussion

Injunctive relief in a patent case is authorized by 35 U.S.C. § 283.[12] However, as in other cases, a preliminary injunction is a "drastic and extraordinary remedy that is not to be routinely granted."  National Steel Car, Ltd. v. Canadian Pacific Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004)(quotations omitted); see also MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1339 (Fed. Cir. 2005)("A preliminary injunction is extraordinary relief that is available only on a special showing of need for relief pendente lite ... .").

A district court may use its discretion to grant a preliminary injunction if a patent holder has shown that: (1) it has a reasonable likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) the hardships balance in its favor; and (4) the injunction is in keeping with the public interest.  Id. at 681.  While an overall balancing of the four factors is required before a district court may grant a preliminary injunction, a district court may deny

---

[12]     35 U.S.C. § 283 states: "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

a preliminary injunction if the patentee does not show any one of the four factors, especially either of the first two, without analyzing the others. Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1356 (Fed. Cir. 2002).

In deciding CIBA's motion for preliminary injunction, the Court will start and stop with the second factor, irreparable harm, because it is dispositive. See Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed. Cir. 1990) ("[M]any courts and commentators list first the question of whether irreparable harm to the movant will result from denial of a preliminary injunction."). The Court need not address the first factor, reasonable likelihood of success on the merits. The Court simply will assume, without deciding, that CIBA has made a strong or clear showing thereof. See Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 973-74 (Fed. Cir. 1996)(explaining that district court need not make a finding on a movant's likelihood of success on the merits if it assumes a strong or clear showing thereof).

When a district court is faced with a strong or clear showing of likelihood of success on the merits, it may presume irreparable harm. Eli Lilly & Co. v. American Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir. 1996); Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1580-81 (Fed. Cir. 1983). This presumption is based on the understanding that "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that

monetary damages will always suffice to make the patentee whole. The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money." Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1456-57 (Fed. Cir. 1988)(footnote omitted). Even with this understanding, however, the presumption of irreparable harm, like other presumptions of fact, may be rebutted by evidence that the patentee's likely actual damages can be calculated or by acts of the patentee incompatible with the right to exclude. Cordis Corp. v. Boston Scientific Corp., 99 Fed. Appx. 928, 933 (Fed. Cir. 2004) (concluding presumption rebutted); Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)(same); Rosemount, Inc. v. United States Int'l Trade Comm'n, 910 F.2d 819, 822 (Fed. Cir. 1990)(same); Illinois Tool Works, 906 F.2d at 682 (same); T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987)(same).

Given the fact-specific nature of patent litigation, the Federal Circuit has not ventured to provide a comprehensive list of factors that would sufficiently rebut a presumption, or support a finding, of irreparable harm. However, with the apparent approval of the Federal Circuit, district courts have considered combinations of various factors in their irreparable harm analyses that go towards whether the patentee's likely actual damages can be calculated, whether the patentee has

11

engaged in acts incompatible with the right to exclude, or both.  These factors include: (1) the availability of monetary damages; (2) the degree of difficulty in calculating  monetary damages; (3) the alleged infringer's solvency and ability to satisfy any judgment; (4) the likelihood that competitors will be encouraged to infringe absent an injunction; (5) the remaining life of the patent; (6) the presence of noninfringing competitors in the market; (7) the harm to the patentee's reputation; (8) the patentee's delay in filing the motion for preliminary injunction; and (9) the patentee's licensing of its patent.  See Cordis, 99 Fed. Appx. at 933; Eli Lilly, 82 F.3d at 1578; Pharmacia & Upjohn Co. v. Ranbaxy Pharms., Inc., 85 Fed. Appx. 205, 215 (Fed. Cir. 2003); Rosemount, 910 F.2d at 822; Hybritech, 849 F.2d at 1456.  The Court will consider the combination of factors relevant here.

Looking first at the factors that indicate whether the patentee's likely damages can be calculated, the Court finds that most of the harm to CIBA would be in the form of reparable monetary damages arising from the sale of J&J's ACUVUE® OASYS™ lenses and any resulting decline in sales of CIBA's $O_2$OPTIX™ lenses caused by patients who may choose to use ACUVUE® OASYS™ over $O_2$OPTIX™ and the many other daily and 7-day extended wear lenses currently on the domestic market.  Mr. Valenti conceded that there might be some competition between J&J's ACUVUE® OASYS™ and CIBA's $O_2$OPTIX™, though other evidence suggests that J&J itself would feel the most impact because

12

ACUVUE® OASYS™ would cannibalize existing J&J ACUVUE® products.[13]  Any monetary damages, however great or small, would not be inordinately difficult to prove.  CIBA elicited testimony from Mr. Valenti that there is an organization that provides numbers on the sales of contact lenses.  CIBA also offered a declaration of Matthew R. Lynde, an economist, that estimated the likely damages that J&J would suffer if a preliminary injunction was wrongly issued.  Though both Mr. Valenti's testimony and Mr. Lynde's declaration were offered for setting a bond amount, they show that CIBA has experts, facts, and figures available to it for estimating monetary damages.  And, it is beyond dispute that J&J is solvent and would be able to pay any such damages.

In seeking a preliminary injunction, CIBA did not rely on the presumption of irreparable harm alone.  When confronted with the surprising fact that J&J's ACUVUE® OASYS™ lenses would not be competing with CIBA's Focus® NIGHT & DAY™ 30-day extended wear lenses as CIBA had expected, CIBA shifted its irreparable harm focus by submitting a declaration of Jeffrey Cohen, CIBA Vice President of Marketing, Lens and Lens Care, North America, as purported proof of harm that money would not address.  Mr. Cohen avers that the introduction of ACUVUE® OASYS™ lenses into the market, regardless of their modality, would

---

[13]    CIBA's own expert assumes that 49% of the sales of the ACUVUE® OASYS™ lenses will come at the expense of ACUVUE® ADVANCE™ lenses. (Def. Ex. 3 at ¶ 8.)

13

cause "substantial reputational harm" to CIBA "as the worldwide leader in silicone hydrogel technology;" would negatively impact CIBA's ability to earn a return on its investments; would affect CIBA's ability to become the "lens of choice for a greater number of eye care professionals;" would hinder CIBA's efforts to improve its market position over J&J's currently dominant one; and "might encourage others to introduce infringing silicone hydrogel products into the marketplace." (CIBA Supp. Conf. App. at t. 2.)

The Court has considered Mr. Cohen's declaration but fails to appreciate how the harms he predicts would be realized by J&J's introduction of yet another daily soft contact lens among the several hundred already on the market, or a 7-day extended wear soft contact lens among the over 40-50 already on the market, particularly since this market already includes J&J's own allegedly infringing ACUVUE® ADVANCE™ lenses as to which CIBA has not sought preliminary injunctive relief.  According to Mr. Cohen himself, this market also soon will include silicone hydrogel lenses from Cooper Vision, Inc., CIBA's only other major competitor aside from J&J and B&L.  The only thing clear from Mr. Cohen's declaration and other CIBA evidence is that CIBA enjoys a dominant place in the more exclusive 30-day extended wear market; this place will not be impacted by the ACUVUE® OASYS™ lenses.

Turning second to those factors that indicate inconsistency with the right to

14

exclude, the Court finds compelling that CIBA has been willing to share the Nicolson patents with two of three of its major domestic competitors, first in December 2002 when it offered to license them to J&J and second in July 2004 when it actually licensed them to B&L as part of the settlement of the B&L case. Undoubtedly recognizing that the Federal Circuit has found that a pattern of licensing may rebut the presumption of irreparable harm, see, e.g., T.J. Smith, 821 F.2d at 648, CIBA submitted a declaration of Robin Terrell, CIBA Head of Program Management Office, averring that CIBA's focus is now on silicone hydrogel lenses "as the sole growth engine for our business," which was not the case in December 2002 when CIBA offered J&J a license to the Nicolson patents. The Court finds this averment unavailing, particularly since it does not explain CIBA's willingness to license the Nicolson patents to B&L, on a non-exclusive basis, as recently as July 2004.

The Court also finds significant that CIBA has not sought a preliminary injunction in the first case filed in September 2003 and the second case filed in December 2004, both involving the ACUVUE® ADVANCE™ lenses.[14] When he

---

[14] The Court does not consider CIBA's four month delay in filing its motion for preliminary injunction important in its irreparable harm analysis. CIBA explained that the delay resulted from J&J's failure to timely provide samples of its ACUVUE® OASYS™ lenses and CIBA's recent discovery of J&J's ambitious launch schedule. CIBA did not explain exactly why it could not have obtained samples from Europe, where ACUVUE® OASYS™ lenses have been sold since March 2005, but did explain that it was unsure until recently whether the lenses

15

still believed that the ACUVUE® OASYS™ lenses would be marketed for 30-day extended wear use, CIBA's designated representative distinguished CIBA's approach in the three cases by testifying that CIBA was seeking a preliminary injunction against the ACUVUE® OASYS™lenses and not the others because the ACUVUE® OASYS™lenses would be competing head-to-head with the 30-day Focus® NIGHT & DAY™lenses.  Now that this distinction is gone, the three allegedly infringing products have more in common and CIBA's irreparable harm argument has been sapped of its strength.

### III. Conclusion

J&J has successfully rebutted the presumption of irreparable harm to CIBA by demonstrating that any likely actual harm is reparable and that CIBA has acted inconsistently with its right to exclude.  Without irreparable harm, CIBA cannot avail itself of the extraordinary remedy of preliminary injunctive relief.  See Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1272 (Fed. Cir. 1985)("The presumption does not change the ultimate equitable showing needed to justify a preliminary injunction.").

---

sold here and abroad would be the same.  See Advanced Comm. Design, Inc. v. Premier Retail Networks, Inc., 46 Fed. Appx. 964, 984 (Fed. Cir. 2002)("[W]e excuse delayed requests for [Fed.R.Civ.P.] 65 relief when ... the movant has offered a 'good explanation' for that delay.")(citing High Tech. Med. Instr., Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995)).

It is hereby **ORDERED:**

1.    CIBA Vision Corporation's Motion for Temporary Restraining Order (Doc. 21), treated as a motion for preliminary injunction, is **DENIED.**

2.    CIBA Vision Corporation's Motion in Limine to Exclude All or Parts of the Testimony of Johnson & Johnson's Experts Dr. David C. Turner and Dr. Michael A. Brook (Doc. 37) is **DENIED** without prejudice.

3.    The parties shall notify the Court on or before **September 9, 2005** as to whether they have reached an agreement on the issues raised by CIBA with respect to the May 12, 2005 Protective Order Governing Confidentiality of Documents (Doc. 81).

4.    The parties shall file on or before **September 9, 2005** a new joint motion for entry of an amended case management and scheduling order.

5.    Each party shall file on or before **September 9, 2005** a listing of all documents that have been filed under seal on a provisional basis, a listing of those documents that each party wants kept under seal, and the particularized reasons therefor.[15]  The parties should narrowly tailor the list of documents desired to be kept under seal with the understanding that whether documents may be filed under seal is a separate issue from whether the parties may agree that the documents

---

[15]    The parties should identify each document by party name, appendix number, and tab number rather than re-submitting any previously filed documents.

17

are confidential, that motions to file under seal are disfavored, and that the Court will permit documents to remain under seal only upon a finding of extraordinary circumstances and particularized need.  See Brown v. Advantage Eng'g, Inc., 960 F.2d 1013 (11th Cir. 1992).

**DONE AND ORDERED** at Jacksonville, Florida on August 18, 2005.

_____
TIMOTHY J. CORRIGAN
United States District Judge

p.
Copies to counsel of record