# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JOHNSON & JOHNSON
VISION CARE, INC.,

        Plaintiff and
        Counterclaim Defendant,

vs.                              Case No. 3:05-cv-135-J-32TEM
                                  Case No. 3:06-cv-301-J-32TEM

CIBA VISION CORPORATION,

        Defendant
        Counterclaim Plaintiff.

---

## ORDER[1]

    This Order addresses the parties' respective motions for summary judgment

filed in this patent infringement case pertaining to extended-wear contact lenses, and

related methodology.   Specifically, before the Court are CIBA Vision Corporation's

("CIBA") Motion For Partial Summary Judgment  (Doc. 151) and Johnson & Johnson

Vision Care's ("J&J") Corrected Motion For Summary Judgment.  (Doc. 155.)  The

parties have filed responses to the motions (Docs. 162, 165) and voluminous exhibits

---

[1]     Under the E-Government Act of 2002, this is a written opinion and therefore
is available electronically.  However, it is intended to decide the motions addressed
herein and is not intended for official publication or to serve as precedent.

(see Docs. 152-154, 156, 160, 161, 163, 166, 167, S-21, S-22, S-23, S-24, S-25), which the Court has reviewed.  The Court held oral argument on the motions on October 17, 2008, (see Doc. 181), the record of which is incorporated herein.[2]

## I.    Background

This consolidated case pertains to CIBA's six patents for silicone hydrogel contact lenses extended-wear contact lenses for continuous wear of at least 24 hours and up to 30 days, and related methodology.  United States Patent Nos. B1 5,760,100 ("'100 Patent"), B1 5,776,999 ("'999 Patent"), B1 5,789,461 ("'461 Patent"), B1 5,849,811 ("'811 Patent"), 5,965,631 ("'631 Patent") and 6,951,894 B1 ("'894 Patent") (collectively "the Nicolson patents" or "CIBA patents").  The six patents stem from a single application for the '100 Patent entitled "Extended Wear Ophthalmic Lens," and originally listing 158 claims, which was filed with the United States Patent and Trademark Office ("USPTO") on December 8, 1995.[3]  The original application was

---

[2]    In addressing these motions, the Court also considers CIBA Vision Corporation's Motion To Strike New Expert Opinions Of Dr. William J. Benjamin (Doc. 158); CIBA Vision Corporation's Motion To Strike Opinion Testimony In Responsive Declaration Of Douglas G. Vanderlaan, Ph.D. (Doc. 171); CIBA Vision Corporation's Motion To Strike Portions Of The Responsive Declarations Of Johnson & Johnson Vision Care, Inc.'s Experts (Doc. 172) and J&J's responses. (Docs. 168, 185, 186.)

[3]    These background facts are based in large part on the recitation of facts provided by CIBA in Appendix A to its motion for Summary Judgment.  (Doc. 151 at 151-52), to which J&J has not objected.  (See also Doc. 121 (Corrected *Markman* Order).)

subsequently divided into four distinct patent applications which eventually resulted in the '100, '811, '999, and '461 Patents.  The patents include both device and method patents, along with divisionals and continuations thereof.  The USPTO issued the '100 Patent on June 2, 1998.[4]  CIBA released its first silicone hydrogel extended wear lenses named Focus® NIGHT & DAY™ in 1998.

Competitor Bausch & Lomb, Inc. ("B&L") requested a reexamination of four of CIBA's patents ('100, '999, '461, and '811), relying on its own patent, U.S. Patent No. 5,034,461 by Dr. Yu-Chi-Lai ("'461 Lai Patent").  B&L argued the CIBA patents were anticipated by the '461 Lai Patent, and/or were rendered obvious by a combination of the '461 Lai Patent and prior art plasma surface treatments.  In March 1999, the USPTO reopened reexamination proceedings for each of the four CIBA patents to examine them in light of the '461 Lai Patent and prior art surface treatments.  The USPTO initially rejected some of the claims of the CIBA patents as anticipated by prior art and/or obvious in light of the '461 Lai Patent in combination with prior art. However, based on submissions by CIBA, the USPTO examiner determined that the

---

[4]     The related divisional patents were similarly issued: '999 Patent on November 21, 2000; the '461 Patent on November 21, 2000; and the '811 patent on November 14, 2000.  On July 1, 1998, CIBA filed another divisional application to the '100 patent application, which was approved by the USPTO as Patent '631, dated October 12, 1999, followed by another divisional application to the '100 Patent application, filed on August 17, 2000, which became the '894 patent issued on October 4, 2005, followed by a Certificate of Correction, dated March 21, 2006.

amendments to the patents and the arguments made by CIBA overcame all pending objections.  Additional claims were also allowed, and reexamination certificates were issued by the USPTO on the '100, '999, '811, and '461 Patents in November 2000.

On March 8, 1999, CIBA brought an infringement action against B&L in the United States District Court for the Northern District of Georgia, 2:99-CV-0034-RWS ("Ga. Litigation" or "CIBA v. B&L") alleging that B&L's extended wear silicone hydrogel lenses, marketed under the PureVision name, infringed the '100, '999, '461, and '811 Patents.  B&L argued that it, not CIBA, was the first to invent extended wear silicone hydrogel lenses, and that its RD-677/Balafilcon A lens, which was ultimately developed into its commercial PureVision product, anticipated the CIBA Patents.  The Georgia court stayed the case pending the reexamination proceedings.  The case was later reopened and tried.  Following trial but before the issuance of an opinion, CIBA and B&L reached a settlement in July, 2004, and the district judge entered a consent decree on July 23, 2004.

In 2006, another competitor, CooperVision, Inc., brought a declaratory judgment action in the United States District Court of Delaware, Civ. No. 06-239-SLR, seeking a declaration that the CIBA Patents were invalid and/or unenforceable and that CooperVision's commercial silicone hydrogel product, Biofinity, did not infringe the claims of the CIBA Patents.  In November, 2007, CIBA and CooperVision reached a settlement in which CooperVision consented to have a judgment taken against it

4

and to sell its Biofinity product pursuant to a royalty-bearing license under the CIBA patents. (See Doc. 114 (Consent Judgment, 11/21/07.)

This case relates to J&J's newest silicone hydrogel lens product - the Phoenix contact lens, which is marketed as the ACUVUE®OASYS™ ("Acuvue Oasys"). J&J has manufactured its Acuvue Oasys lens in Jacksonville, Florida since late 2004. The product has been sold in Europe and in the United States since 2005. On November 12, 2004, J&J sought U.S. Food and Drug Administration ("FDA") to sell the Avuvue Oasys lens for up to 30 days of continuous wear. J&J later elected to limit its request for approval for up to 6 nights/7 days of continuous wear, receiving FDA clearance on October 29, 2004.[5]  J&J contends that its Acuvue Oasys lenses are soft silicone hydrogel contact lenses that, unlike the older silicone hydrogel lenses sold by CIBA and B&L, do not required a surface treatment for the lens to be wearable. (See also Doc. 1.)

The CIBA patents relate to silicone hydrogel lenses suitable for extended continuous wear periods of at least 24 hours and up to 30 days. The '100 Patent describes the requirements for the invention.

> One ophthalmic compatibility requirement for contact lenses is that the lens must allow oxygen to reach the cornea in an amount sufficient for long-term corneal health.

---

[5]     In Europe, J&J self-certified that Acuvue Oasys contact lenses can be worn for up to 30 days of continuous wear. In Canada, J&J received regulatory approval to sell the Acuvue Oasys lens for up to 29 days of continuous wear.

> The contact lens must allow oxygen from the surrounding air to reach the cornea because the cornea does not receive oxygen from the blood supply like other tissue. If sufficient oxygen does not reach the cornea, corneal swelling occurs. Extended periods of oxygen deprivation causes the undesirable growth of blood vessels in the cornea. "Soft" contact lenses conform closely to the shape of the eye, so oxygen cannot easily circumvent the lens. Thus, soft contact lenses must allow oxygen to diffuse through the lens to reach the cornea.
>
> Another ophthalmic compatibility requirement for soft contact lenses is that the lens must not strongly adhere to the eye. Clearly, the consumer must be able to easily remove the lens from the eye for disinfecting, cleaning, or disposal. However, the lens must also be able to move on the eye in order to encourage tear flow between the lens and the eye. Tear flow between the lens and eye allows for debris, such as foreign particulates or dead epithelial cells to be swept from beneath the lens and, ultimately, out of the tear fluid. Thus, a contact lens must not adhere to the eye so strongly that adequate movement of the lens on the eye is inhibited.

('100 Patent col.1 ll.29-53.)   The patents sought to address these two ophthalmic compatibility requirements. Claim 1 of the reexamined '100 Patent is a representative independent apparatus claim, designed to carry out the objectives of the device patent.  It reads as follows:

> 1.    An ophthalmic lens having a surface modified by a surface treatment process, said lens having ophthalmically compatible inner and outer surfaces, said lens being suited to extended periods of wear in continuous, intimate contact with ocular tissue and ocular fluids while having adequate movement on the eye with blinking to promote adequate tear exchange and without producing significant corneal swelling, without having substantial amounts of lipid adsorption, and without causing substantial wearer discomfort during a period of wear of

at least 24 hours, said lens comprising a polymeric material which has a high oxygen permeability and a high ion permeability, said polymeric material being formed from polymerizable materials  comprising:

    (a)    at least one oxyperm polymerizable material and

    (b)    at least one ionoperm polymerizable material,

wherein said lens allows oxygen permeation in an amount sufficient to maintain corneal health and wearer comfort during the period of extended, continuous contact with ocular tissue and ocular fluids,

wherein said oxyperm polymerizable material forms a phase or phases substantially separate from the phase or phases formed by said ionoperm polymerizable material,

wherein said lens allows ion or water permeation via ion or water pathways in an amount sufficient to enable the lens to move on the eye such that corneal health is not substantially harmed and wearer comfort is acceptable during the period of extended, continuous contact with ocular tissue and ocular fluids,

wherein said ionoperm polymerizable material, if polymerized alone would form a hydrophilic polymer having a water content of at least 10 weight percent upon full hydration, and

wherein said ophthalmic lens has an oxygen transmissibility of at least about 70 barrers/mm and an ion permeability characterized either by (1) an Ionoton Ion Permeability Coefficient of greater than about $0.2 \times 10^{-6} cm^2/sec$ or (2) an Ionoflux Diffusion Coefficient of greater than about $1.5 \times 10^{-6} mm^2/min$. wherein said ion permeability is measured with respect to sodium ions.

('100 Patent, cl.1.)

## II.    <u>Summary Judgment Legal Standard</u>

"The party moving for summary judgment carries the burden of demonstrating

the absence of any genuine issue of material fact, and that the party so moving is

entitled to judgment as a matter of law." C.R. Bard, Inc., 911 F.2d at 672. "In ruling on a motion for summary judgment, the district court is required to view the evidence presented in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of the nonmoving party." C.R. Bard, Inc., 911 F.2d at 672. "Summary judgment is therefore appropriate when there is no genuine issue of material fact or when, drawing all factual inferences in favor of the nonmoving party, no 'reasonable jury could return a verdict for the nonmoving party.'" Upsher-Smith Laboratories, Inc. v. Pamlab, L.L.C., 412 F.3d 1319, 1322 (Fed. Cir. 2005). "'In rendering a decision on a motion for summary judgment, a court must "view the evidence presented through the prism of the substantive evidentiary burden" that would inhere at trial.'" Apple Computer, Inc. v. Articulate Systems, Inc., 234 F.3d 14, 20 (Fed. Cir. 2000)(citation omitted). To grant summary judgment, the Court "must conclude 'that even if all material factual inferences are drawn in favor of the nonmovant, there is no reasonable basis on which the non-movant can prevail.'" Leggett & Platt, Inc. v. VUTEk, Inc., 537 F.3d 1349, 1354 (Fed. Cir. 2008)(citation omitted).

### III.    The Parties' Claims and Defenses

In its complaint in Case No. 3:05-cv-135, filed February 8, 2005, J&J seeks a declaration of noninfringement of the '100, '999, '461, '811, and '631 Patents, and a declaration that the '100, '999, '461, '811, and '631 Patents are invalid because of

8

failure to meet one or more of the conditions for patentability specified by 35 U.S.C. §§ 101, 102, 103 and/or 112. (Doc. 1.)  CIBA counterclaimed that J&J's Phoenix lens infringes on the '811, '631, '100 and '461 Patents.  (Doc. 22; 3:03-cv-800 Doc.94.) J&J denied the allegations in CIBA's counterclaim, and re-alleged that the '811, '631, '100, and '461 patents are not infringed and are invalid.[6]

CIBA, in its complaint against  J&J, alleges that J&J's Acuvue Oasys with Hydraclear™ Plus lens infringes upon CIBA's '894 Patent.  (3:06-cv-301 Doc. 1.)  In its answer to CIBA's complaint, J&J denies alleged infringement and alleges as a defense that CIBA's '894 Patent is invalid under 35 U.S.C. §§  101, 102, 103 and/or 112.

CIBA now is asserting that J&J's contact lens infringes upon 31 claims from the five of the six CIBA patents at issue.[7]  The presently asserted claims are: '100 Patent cls. 1, 5, 8, 11, 28, 32, 33, 34 and 56; '811 Patent cls. 1, 4, 7, 11, 12, 13, 28 and 29; '461 Patent cls. 1, 2, 4, 6, 7, 12 and 14; '631 Patent cl.1; and '894 Patent cls. 85, 89, 90, 91, 96 and 99.  (Doc. 151 at 7.)  The parties have stipulated that the J&J Acuvue Oasys lens "(1) is an ophthalmic lens; (2) comprises a polymeric material; 3) is autoclaved; (4) comprises . . . an inner and outer surface; and (5) is a contact lens."

---

[6]     J&J also raises other claims and defenses not relevant to the motions for summary judgment.

[7]     No claims are asserted for the '999  Patent entitled Methods of Using and Screening Extended Wear Contact Lenses.  (Doc. 151 at 7.)

(Doc. 151 at 7.)

### A.    Infringement and Non-Infringement

To prevail on infringement, the patentee "must establish by a preponderance of the evidence that the accused device infringes one or more claims of the patent either literally or under the doctrine of equivalents." Advanced Cardiovascular Systems, Inc. v. Scimed Life Sys., Inc., 261 F.3d 1329, 1336 (Fed. Cir. 2001); see also Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987)(infringement occurs where the alleged infringer's product contains every element of at least one claim of the patent exactly or by substantial equivalent). Under the doctrine of equivalents, a claim limitation is equivalently present if there are only "insubstantial differences" between the limitation and the corresponding aspects of the device. CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1318-19 (Fed. Cir. 2000). "When a patentee with the burden of proof seeks summary judgment of infringement, it must make a prima facie showing of infringement as to each accused device before the burden shifts to the accused infringer to offer contrary evidence." L & W, Inc. v. Shertech, Inc., 471 F.3d 1311, 1318 (Fed. Cir. 2006); see also Exigent Tech., Inc. v. Atrana Solutions, Inc., 442 F.3d 1301, 1307 n.6 (Fed. Cir. 2006)(party with the burden of proof on an issue must provide evidence sufficient, if unopposed, to prevail as a matter of law).

On the other hand, to support a summary judgment for noninfringement, "it

10

must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1371 (Fed. Cir. 2002).   "Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." TechSearch, L.L.C., 286 F.3d at 1369 (citing ATD Corp. v. Lydall, Inc., 159 F.3d 534, 540 (Fed. Cir. 1998)).

Given the disputed issues of material fact, CIBA's motion for partial summary judgment as to infringement of certain elements of the asserted claims (Doc. 151 at 7-12), and J&J's motion for summary judgment of non-infringement  (Doc. 155 at 18-23) are **DENIED.**

## B.   <u>Validity</u>

CIBA's patent claims are entitled to a presumption of validity, and J&J bears the burden of showing, by clear and convincing evidence, the invalidity of the CIBA's claims. In re Swanson, 540 F.3d 1368, 1377 (Fed. Cir. 2008); Voda v. Cordis Corp., 536 F.3d 1311, 1322 (Fed. Cir. 2008).  Further, "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim." 35 U.S.C. §

282.[8]  Because of the presumption of validity, a patentee responding to a challenge to the patent's validity need only submit sufficient evidence to rebut any proof of invalidity offered by the challenger, and, where the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue.  Canon Computer Systems, Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998).

"[J&J's] burden is especially difficult when the prior art was before the [US]PTO examiner during prosecution of the application."  Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 1467 (Fed. Cir. 1990).[9]  Both CIBA and J&J seek judgment as a matter of law on various J&J invalidity defenses.

### 1.    Invalidity For Lack Of "Enablement" (35 U.S.C. § 112 ¶ 1)

Both parties seek summary judgment on J&J's claim/defense that the CIBA patents are invalid for lack of enablement. The invalidity defense of enablement is based upon 35 U.S.C. § 112 which provides, in part, that

---

[8]    "If this statutory burden is not met, '[c]ourts do not find patents "valid," only that the patent challenger did not carry the "burden of establishing invalidity in the *particular* case before the court."'"  In re Swanson, 540 F.3d at 1377 (emphasis in original)(citations omitted).

[9]    According to CIBA, all of the prior art asserted by J&J in this case in support of its invalidity arguments, with the exception of two - the Fluoroperm 92 lens and the Sokolyuk - was before the USPTO in the original prosecution of CIBA's applications prior to granting the patents and again during reexamination.  (Doc. 151 at 14.)  J&J does not dispute this assertion.

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

35 U.S.C. § 112 ¶ 1. "The 'enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation.'" Sitrick v. Dreamworks, LLC, 516 F.3d 993, 999 (Fed. Cir. 2008)(citation omitted). "The full scope of the claimed invention must be enabled. . . . A patentee who chooses broad claim language must make sure the broad claims are fully enabled." Id. Enablement is determined as of the effective filing date of the patent. Plant Genetic Systems, N.V. v. DeKalb Genetics Corp., 315 F.3d 1335, 1339 (Fed. Cir. 2003). "The party alleging invalidity for lack of enablement bears the burden of proving by clear and convincing evidence that the specification of a challenged patent fails to teach one of ordinary skill in the art how to make the invention." Ormco Corp. v. Align Tech., Inc., 498 F.3d 1307, 1318 (Fed. Cir. 2007), cert. denied, 128 S.Ct. 2430 (2008).

There are disputed issues of fact as to whether the CIBA patents enable 1) claims not requiring any surface treatment or post-manufacturing surface treatment;[10]

---

[10]     The Court does not here makes the legal determination that "surface treatment" or lack thereof requires enablement of a full range of *products* claimed in a patent, Automotive Techs. Int'l, Inc. v. BMW of N. America, Inc., 501 F.3d 1274 (Fed. Cir. 2007); Liebel-Flarsheim Co. v. Medrad, Inc., 481 F.3d 1371 (Fed.

and 2) extended wear lenses at the lower end of the claimed ion permeability range

Cir. 2007) as opposed to the enablement of different *methods* or *processes* for making the full scope of claimed products.   Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1071 (Fed. Cir. 2005)("[e]nablement does not require the inventor to foresee every means of implementing an invention"); Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1335 (Fed. Cir. 2003)("'the specification need teach only one mode of making and using a claimed composition'" (citation omitted)), only that there is a factual dispute on this record whether the patents enable the skilled artisan to make and use the claimed lenses without a surface treatment or a pre-manufacturing surface treatment.

The Court notes the following, however.  The majority (23) of the asserted claims explicitly include "surface treatment" (or "altering the surface") as an express limitation.  The remaining 8 asserted claims ('100 Patent cl. 56; '631 Patent cl.1; '894 Patent cls. 85, 89, 90, 91, 96, and 99) make no mention of requiring a  "surface treatment" or requiring no surface treatment.  Thus, while J&J never has delineated which claims it contends must be successfully enabled both with and without a surface treatment, the specific terms of the asserted claims seem to limit J&J's argument to these eight asserted claims.

Further, the object of this invention is to provide a material with balanced oxygen and ion permeabilities, on-eye movement and tear exchange sufficient for good corneal health and wearer comfort during extended continuous wear which does not promote substantial corneal swelling or consumer discomfort.  ('100 Patent col.2 ll. 39-58.)  The embodiments discussed have "ophthalmically compatible surfaces" that are "more hydrophilic and lipophobic than the core polymeric material."  A preferred embodiment is a method of forming an ophthalmic lens having high oxygen and ion permeabilities that "includes treating the surface of the lens to render the lens more hydrophilic than the core."  (Id. col.3 ll.12-23.)  Other embodiments and preferred embodiments are disclosed, none of which mention surface treatment.  The patent specifies that the "ophthalmic lenses of the present invention have a surface which is biocompatible with ocular tissue and ocular fluids during the desired extended period of contact."  (Id. col.42 ll.21-23.)  The patent defines "surface treatment processes" as "processes to render a surface more ophthalmically compatible . . . ."  Id.  col.42 ll. 44-45; see also Doc. 121 at 20-23.)

Seemingly at issue is whether the remaining 8 asserted claims are required to be enabled and practiced without a surface treatment, as argued by J&J.  (Doc. 155 at 30; Tr. 148.)  ("Tr. ___" refers to the Transcript of the Summary Judgment oral argument held on October 17, 2008.  (Doc. 181).)  The Court will allow further briefing on this issue.

that also move on the eye.  J&J's motion for summary judgment as to enablement (Doc. 155 at 25-34) is **DENIED**.  Further, CIBA has failed to carry its burden of demonstrating the absence of any genuine issue of material fact as to its enablement arguments regarding the operability of CIBA patent examples; whether undue experimentation is required to establish ophthalmic compatibility; and the enablement of a hydrophilic polymer with water content of at least 10 percent upon full hydration. CIBA's motion for summary judgment as to enablement (Doc. 151 at 51-55) is likewise **DENIED**.

## 2.   <u>Invalidity for "Anticipation" (35 U.S.C. § 102)</u>

Section 102(a) provides that an issued patent is invalid if

> the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent . . . .

35 U.S.C. §  102(a).  Section 102(b) provides that "a person shall be entitled to a patent unless . . . the invention was patented or described in a printed publication . . . more than one year prior to the date of the application for patent."  35 U.S.C. § 102(b).  "Section 102 embodies the concept of novelty - if a device or process has been previously invented (and disclosed to the public), then it is not new, and therefore the claimed invention is 'anticipated' by the prior invention." <u>Net MoneyIN, Inc. v. VeriSign, Inc.</u>, __F.3d __, 2008 WL 4614511, at *8 (Fed. Cir. Oct. 20, 2008).

In short,

> 35 U.S.C. § 102 provides that novelty is negated if the invention was known or used by others in the United States, § 102(a); or if the invention was patented or described in a printed publication, § 102(b); or in public use or on sale, § 102(b); or derived from another, § 102(f); or the prior invention of another who did not abandon, suppress, or conceal it, § 102(g).

In re Omeprazole Patent Litigation, 483 F.3d 1364, 1377 n.2 (Fed. Cir. 2007).  CIBA moves for summary judgment on J&J's anticipation defense.

"[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." Advanced Display Systems, Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000).  A determination that a patent is invalid as being anticipated under 35 U.S.C. § 102 requires a finding that "'each and every limitation is found either expressly or inherently in a single prior art reference.'" Transclean Corp. v. Bridgewood Services, Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002)(citation omitted). Conversely, absence from the prior art of any claimed element negates anticipation.  Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1572 (Fed. Cir. 1992).

The Federal Circuit has recently clarified that "'disclosure of each element is not quite enough'" to establishing prior art anticipation, and reiterated that "[b]ecause the

hallmark of anticipation is prior invention, the prior art reference - in order to anticipate under 35 U.S.C. § 102 - must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" Net MoneyIN, Inc., 2008 WL 4614511, at *8, 10 (citations omitted). "[T]he 'arranged as in the claim' requirement applies to all claims and refers to the need for an anticipatory reference to show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order. The test is thus more accurately understood to mean 'arranged or combined in the same way as in the claim.'" Id., at *8. "[U]nless a reference discloses within the four corners of the document not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the thing claimed and, thus, cannot anticipate under 35 U.S.C. § 102." Id. at *10 (holding that district court erred in combining parts of separate protocols shown in the prior art reference in concluding that patent claim was anticipated; "differences between the prior art reference and a claimed invention, however slight, invoke the question of obviousness, not anticipation").

The doctrine of inherency may be applied to the "anticipation" analysis. "'Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates.'" Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1327 (Fed. Cir. 2001) (citation omitted). "[A]

17

limitation or the entire invention is inherent and in the public domain if it is the 'natural result flowing from' the explicit disclosure of the prior art." Schering Corp. v. Geneva Pharm., 339 F.3d 1373, 1379 (Fed. Cir. 2003). The evidence of inherency "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." Continental Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991). "'Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient.'" Id. at 1269 (citation omitted)(emphasis in original). "'[T]he [prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.'" Net MoneyIN, Inc., 2008 WL 4614511, at *10 (citation omitted). The Court compares the properly constructed CIBA patent claims with the subject matter described in the prior art reference, and identifies the elements disclosed in the allegedly anticipating reference. Ricoh Co., Ltd. v. Katun Corp., 380 F. Supp.2d 418, 438 (D. N.J. 2005)(citing Helifix Ltd. v. Blok Lok, Ltd., 208 F.3d 1339, 1346 (Fed. Cir. 2000)).

J&J asserts invalidity as a defense to CIBA's infringement claims, contending

that six pieces of prior art "anticipate" the CIBA patents.[11]   J&J does so without conceding its argument that many terms in the CIBA patents are indefinite as a matter of law, though counsel for J&J readily recognized the inherent inconsistency in arguing that prior art unequivocally and convincingly anticipated the CIBA patents on such elements as "ophthalmic compatibility" while at the same time asserting that CIBA patent elements were indefinite as a matter of law.  (Tr. 64.)[12] CIBA argues that because J&J has maintained that the claim term "ophthalmic compatibility" is indefinite as a matter of law, that J&J has adduced no evidence establishing that any of the prior references cited are ophthalmically compatible, which is fatal to both J&J's "anticipation" and "obviousness" defenses.  (Tr. 40-45.)  The Court concludes that in general, J&J's experts are competent to testify as to their opinions of the "ophthalmic compatibility" of prior art references in terms of whether they can be worn comfortably on the eye for the specified period of time, without conducting a full clinical study on each reference.   Whether this expert testimony is sufficient to create a factual

---

[11]     At oral argument, J&J reduced the number from nine to six pieces of prior art supporting "anticipation," stating that they are not asserting that the '461 Lai, the '617 Lai, and the '000 Nandu anticipate because they are each missing one element. (Tr. 68.)  The six pieces of prior art cited by J&J as "anticipating" the CIBA patents are the so-called: RD-677/Balafilcon A lens; the '327 Chang lens; the '579 Lai/Valint lens; the Fluoroperm 92 lens; the Robertson lens; and the WO 9413717 to Sokolyuk lens.  Counsel for J&J affirmed that all nine cited pieces of prior art are relevant to its "obviousness" argument.  (Tr. 67-68.)

[12]     "Tr. ___" refers to the Transcript of the Summary Judgment oral argument held on October 17, 2008.  (Doc. 181.)

question regarding anticipation or obviousness depends upon the specific facts of each example.

      a.    <u>**RD-677/Balafilcon A**</u>

RD-677 is the internal code name give by Bausch & Lomb to a lens material which was eventually used for B&L's commercial silicone hydrogel contact lens product, PureVision extended wear lens, launched in 1999. (Doc. 151 at 16 (citing Doc. 152 (CIBA Ex. 4 ¶ 10).) It was the principal subject of the <u>CIBA v. B&L</u> litigation in the Northern District of Georgia, mentioned above. J&J's prior art "anticipation" and "obviousness" argument apparently arises from the fact that in 1994, B&L filed a 510(k) pre-market notification with the FDA regarding the Balafilcon A lens for daily wear in the United States to which the FDA responded in December 1994, approving the pre-marketing of the lens, a year before CIBA filed its first patent application for the CIBA lenses. (Doc. 152 (CIBA Ex. 4G).) "An abbreviated summary of the 510(k) application . . . was made publically available after December 8, 1994. Doc. 152 (CIBA Ex. 4 ¶ 12).) In February 1999, the FDA approved the B&L PureVision™ (balafilcon A) Visiblity Tinted Contact lens for daily or extended wear from 1 to 7 days, announcing that B&L could begin commercial distribution of the device. Doc. 152 (CIBA Ex. 4H).)

CIBA argues that the B&L 510(k) pre-market application filed in October 1994 was not made public; an abbreviated summary of the 510(k) application was publically

available after December 8, 1994; and a heavily redacted version of the application was made public in or around January, 1995.   According to CIBA, the RD-677/Balafilcon A lens was not "public" as required by Section 102, prior to the December 8, 1995 filing date of the CIBA patent application, and B&L did not make the Balafilcon A lens available to the public until 1999, after receiving FDA approval to market the lens as an extended wear lens.  (Doc. 152 (CIBA Ex. 4 ¶ 11).)  See Ormco Corp., 463 F.3d at 1305 ("[a]rt that is not accessible to the public is generally not recognized as prior art").

CIBA also contends that J&J can not establish "inventorship" of the RD-677/Balafilcon A lens under 35 U.S.C. § 102(g).  CIBA frames the inventorship question as "not only whether all of the claimed features of the invention were present in the prior invention, but whether there is clear and convincing proof that each and every feature of the invention was 'recognized and appreciated' prior to the filing date," (Doc. 151 at 20 (citing Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1381 (Fed. Cir. 2002)), or that the prior invention was "'made in this country.'"  (Id. (quoting 35 U.S.C. 102(g).)  CIBA bases this argument on the assertion that "[t]here is no evidence in this case that prior to December 8, 1995, the Bausch & Lomb inventors of RD-677/Balafilcon A had conducted ion permeability testing on the RD-677/Balafilcon A lenses" and thus the B&L inventors failed to "recognize or appreciate" whether the lens "met the ion permeability element of the CIBA patent

21

claims." (Doc. 151 at 21.)  CIBA also argues that J&J offers no evidence that the B&L inventors ever measured oxygen permeability or transmissibility of their invention using the single point coulometric method specified by the CIBA patents, or "recognized or appreciated" whether the RD-677/Balafilcon A lens had separate phases or co-continuous phases as specified in the CIBA patents, precluding the B&L lens anticipating the CIBA patents.  Finally, CIBA argues that B&L tested an early version of the RD-677/Balafilcon A lens in Australia to determine "ophthalmic compatibility," and thus does not meet the "in this country" requirements of Section 102(g) for anticipation.  (Id. at 22-23.)[13]

J&J responds that the fact that CIBA sued B&L for infringement by its Precision™ lens establishes that CIBA believes that the RD-677/Balafilcon A lens meets all of the claim limitations in the CIBA patent. (Doc. 165 at 26-27.)  Indeed, J&J's expert Paul L. Valint states that "B&L reduced its lens to practice prior to CIBA's invention date - December 8, 1995."  (Doc. 166-4 at 9 (J&J Ex. 61 ¶ 11).)  J&J says that because CIBA does not argue that B&L "abandoned, suppressed or concealed"

_____

[13]     CIBA cites to the case Holmwood v. Sugavanam, 948 F.2d 1236, 1238 (Fed. Cir. 1991) for the proposition that B&L's testing of its RD-677/Balafilcon A lens in Australia disqualifies it for consideration as an anticipatory invention.  (Doc. 151 at 23.)  The case states "[to] establish a date of invention, a party may not rely upon knowledge, use, or activity which took place in a foreign country." 948 F.2d at 1238.  Nothing in that case requires that B&L have its lens product, which was developed in the United States, (Doc. 166-4 at 16 (J&J Ex. 61 ¶ 34)), tested in the United States in order that it may be considered as an anticipatory product.

its invention, summary judgment in favor of CIBA is precluded.  (Doc. 165 at 27 (citing

35 U.S.C. § 102(g)).)  Further, J&J argues that the B&L RD-677/Balafilcon A lens was

known publically prior to 1995, citing to a September 1994 public presentation at a

trade symposium, attended by CIBA inventors (Doc. 166-47 (J&J Ex. 104); Doc. 166-

33 at 18-19 (J&J Ex. 90 at CSFJ117889-90)) and that CIBA was aware that B&L had

filed a 510(k) application to market with the FDA in November 1994.  (Doc. 166-31

(J&J Ex. 88).)

      J&J argues that B&L "recognized and appreciated" that it had invented an

extended wear contact lens, all that is required under the law of inherent anticipation.

As for satisfying the "ophthalmic compatibility element" of the CIBA patents, J&J cites

to 1993 B&L studies of the RD-677/Balafilcon A lens in which B&L reported that

"several patients" wore the B&L lens for extended periods.  J&J argues that the RD-

677/Balafilcon A lens satisfied the "adequate movement on the eye with blinking"

element of the CIBA patents, citing to CIBA inventor Nicolson's testimony in the

Georgia CIBA v. B&L trial that the RD-677/Balafilcon A lens moved on the eye and

had necessary ion permeability.  (Doc. 165 at 27-28.)  However, Nicolson said he was

unable to determine whether the RD-677/Balafilcon A lens has co-continuous phases

or not.   (Doc. 166-24 at 4 (J&J Ex. 81 at 163).)[14]   J&J also contends the RD-

_____

[14]      J&J's expert Valint cites to Nicolson testimony at the Georgia CIBA v. B&L
trial for the proposition that the RD-677/Balafilcon A lens had "phases and co-
continuous phases."  (Doc. 166-4 at 15 (J&J Ex. 61 ¶ 31).)  The testimony cited

677/Balafilcon A lens met the CIBA patents ion and water permeability elements, citing testimony that "supposes" that inasmuch as the RD-677/Balafilcon A lens moved on the eye, it meets minimum ion and water permeability requirements. (Doc. 166-18 (J&J Ex. 75 (CIBA inventor Sweeney at CSFJ788362).) Finally, J&J argues the evidence establishes that the RD-677/Balafilcon A lens met the oxygen permeability and transmissibility values claimed in the CIBA patents.

Whether the B&L RD-677/Balafilcon A lens anticipated the CIBA patents was apparently litigated in the Georgia litigation between CIBA and B&L; in that case, the CIBA patents were not held to be invalid for anticipation as a matter of law.  As a matter of law, J&J fails to establish that the RD-677/Balafilcon A lens anticipates each and every element of the asserted claims of CIBA patents arranged or recited in combined in the same way as recited in any of the asserted CIBA claims.  J&J focuses upon the ophthalmic compatibility and related elements, movement on the eye, ion and water permeability, oxygen permeability and transmissiblity, and pathways and co-continuous phases.  While its evidence on transmissibility and

_____

however is not specific to the RD-677/Balafilcon A lens.  Rather, Dr. Nicolson agreed that it was CIBA's "hypothesis" that "a material having a Dk/t [transmissibility] of between 71 and 72 [would] have co-continuous phases if it was a silicone hydrogel and it moved on the eye.  (Doc. 166-24 at 7 (J&J Ex. 81 (Ga. testimony at 202)).)  J&J expert Valint then deduces that "if the RD-677 lenses met the claimed oxygen and ion permeability values . . . claimed by CIBA concerning the Precision lens, the lenses also meet the pathways, phases and co-continuous phases limitations"  (Doc. 166-4 at 15 (J&J Ex. 761 ¶ 31).).

permeability of the RD-677/Balafilcon A lens is at best scant indeed, J&J offers no competent evidence that B&L had conducted ion permeability testing on the RD-677/Balafilcon A lens and that B&L recognized and appreciated the level of ion permeability claimed by the CIBA patents.  Further, J&J offers no competent evidence that the RD-677/Balafilcon A lens possessed the "pathways" and "co-continuous phases" elements, resting instead on deduction, supposition and expert extrapolations that any lens with ion and water permeability must contain pathways or phases, and not on any clear and convincing evidence or comparison.[15]  Finally, while the record establishes that CIBA inventors knew by 1994 that its competitor, B&L, had developed a soft hydrophillic extended wear contact lens, presentations at symposiums and knowledge that a competitor has submitted a pre-marketing 510(k) application to the FDA (and review of an "abbreviated summary" of that application), cannot, by clear and convincing evidence establish that the B&L RD-677/Balafilcon A prior art lens was "known" in the United States such as to anticipate the CIBA patents.  (See (Doc. 166-48 (J&J Ex. 105 (B&L 510(k) application summary)).)   CIBA's motion for summary judgment on J&J's invalidity for anticipation defense as to the prior art B&L's RD-677/Balafilcon A lens is due to be **GRANTED**.

_____

[15]    On this record, J&J has established that B&L developed the RD-677/Balafilcon A lens in the United States and did not "abandon, suppress , or conceal" its invention. 35 U.S.C. §  102(g).  However, for the reasons stated, it fails to establish by clear and convincing evidence that the RD-677/Balafilcon A lens anticipates all elements of the asserted claims in the CIBA patents.

### b.    '327 Chang

The '327 Chang patent (Chang et al., "Soft Gas Permeable Contact Lens Having Improved Clinical Performance", U.S. Patent No. 5,712,327 (filed June 16, 1992)(issued Jan. 27, 1998)) (Doc.154 (CIBA Ex. 14)), describes itself as "[a] hydrophillic soft gas permeable contact lens having substantially improved clinical performance by the provision of a sufficient higher proportion of hydroxy acrylic units to silicon units in the lens surface layer, as compared to that existing in the lens core, by the surface treatment of the lens . . . ."  (Id. ('327 Chang Patent Abstract).)

### i.    Oxygen Permeability/Transmissibility

J&J contends that the '327 Chang lens meets the oxygen permeability and transmissibility elements of the CIBA patents (or "[a]t the very least" creates an issue of fact) as follows: "the facts demonstrate that the natural result flowing from the disclosure of the Chang patent is extended wear lenses having the required oxygen permeability and transmissibility values, as those terms are applied by CIBA for infringement purposes."  (Doc. 165 at 33.)  The asserted CIBA claims specifying oxygen permeability values require a Dk value of at least 70 barrers (with the '894 Patent cl. 85 "having an oxygen permeability equal to or greater than at least 69 barrers").  J&J cites to the '327 Chang patent specification found in Example 1 of the patent, which states: "[t]he lens thus made has high Dk [oxygen permeability], about 4 to 5 times higher than that of the conventional poly HEMA soft lens, . . . "  (Doc. 165

26

at 33 (citing Doc. 154 (CIBA Ex. 14 ('327 Chang Patent col.6 ll.21-22)).)  J&J states

that by comparing the '327 Chang lens to the then-existing poly HEMA Acuvue lens,

which had an oxygen permeability level of 28, the '327 Chang Example 1 then reads

that its oxygen permeability level as being "4 to 5 times higher" than 28 barrers.

(Doc. 165 at 33.)  J&J cites to its expert Dr. Paul L. Valint, who states that "When

Chang filed his patent, the polyHEMA Acuvue lens with an oxygen permeability of 28

barrers was the most prevalently used hydrogel lens.  Thus, Chang discloses a lens

with oxygen permeability of from 112 to 140 barrers, nearly double the value in CIBA's

claims."  (Doc. 166-4 at 20 (J&J Ex. 61 ¶ 44 (emphasis omitted)).)

J&J also relies upon expert Dr. William J. Benjamin's 2006 tests of a re-created

'327 Chang lens, in which he determined they "were well above the values for oxygen

permeability and transmissibility set forth in the CIBA claims."  (Doc. 166-2 at 5 (J&J

Ex. 59 ¶ 9).)  It is unclear from the evidence cited which example of the '327 Chang

lens Benjamin was testing in 2006.

CIBA contends that J&J has made "numerous" recreations of the '327 Chang

lenses, and that in 2008, Dr. Benjamin measured the oxygen permeability (Dk) of a

thinner recreated '327 Chang Example 3 lens to be 36.16 barrers and the oxygen

transmissibility (Dk/t) to be 58.32 barrers/mm using the coulometric method specified

in the CIBA patents, said values being well below the minimum values required by the

asserted CIBA claims.  (Doc. 152 (CIBA Ex. 4 ¶ 15).)  CIBA argues that the 2006

27

Benjamin results cited by J&J were the result of tests on a different batch of Chang lenses "of different powers and substantially different thicknesses." (Doc. 151 at 28 n.9).) In his deposition, Dr. Benjamin testified that he reported mean values of 81.11 barrers for Dk and 75.14 for Dk/t which constituted an average of the values obtained on the 2006 and the 2008 batches of '327 Chang lenses, a method suggested by J&J's attorney, with which Benjamin did not agree. (Doc. 154 (CIBA Ex. 22 (Benjamin dep. at 178, 186-87)).) CIBA argues that by "making a recreation of the '327 Chang which does not meet the requirements of the CIBA claims, J&J has shown that the '327 Chang patent does not necessarily or inevitably yield a lens that meets the imitations of the CIBA patents," which it says is "fatal" to J&J's anticipation defense. (Doc. 151 at 28-29 (citing Glaxo Inc. v. Novopharm, Ltd., 52 F.3d 1043 (Fed. Cir. 1995)). Finally, CIBA argues that while the disclosure regarding Dk (oxygen permeability) upon which J&J basis its inherency argument is found in Example 1 of the '327 Chang patent, "[J&J is] not asserting Example 1 of Chang against us. They're asserting Example three;" Example 3 has "no oxygen disclosure," and the 2008 test of Example 3 concluded that the '327 Chang does not meet the CIBA asserted claims Dk minimum values. (Tr. at 54, 82-83.)

J&J has the burden of establishing that practice of Example 1 of the '327 Chang patent, which it cites as specifying a "high Dk [oxygen permeability], about 4 to 5 times higher than that of the conventional poly HEMA soft lens," (Doc. 165 at 33),

anticipates the CIBA asserted claims. J&J does not answer CIBA's contention that "the '327 Chang patent does not disclose ion permeability as required by the CIBA patents," (Doc. 151 at 28) and thus must argue that the '327 Chang inherently anticipates the asserted CIBA claims. First, merely surmising that the natural result flowing from the Example 1 disclosure is that the '327 Chang lenses possess the required oxygen permeability and transmissibility values to anticipate the asserted CIBA claims, citing to a then existing contact lens and multiplying its oxygen permeability level by "4 or 5" does not meet J&J's clear and convincing burden of establishing inherent anticipation. Inherency may not be established by probabilities or possibilities. Continental Can Co., 948 F.3d at 1269. "[T]he fact that a claim limitation may be present in a reference does not establish that the reference inherently discloses that limitation." Leggett & Platt, Inc., 537 F.3d at 1356. Second, J&J's reliance on its testing of different batches of re-created '637 Chang lenses producing different Dk (oxygen permeability) results depending on thickness, and focusing on results of a test on an unspecified example which was thicker than the preferred thickness of the prior art, calling it "conventional," does not "clearly and unequivocally" disclose that a person skilled in the art would anticipate all elements of the asserted CIBA claims without picking and choosing and combining various disclosures. Finally, mixing a disclosure from Example 1 and test results on Example 3 of the '327 Chang patent runs afoul of the Federal Circuit's recent affirmation that

29

all of the limitations claimed must be contained in the reference "arranged or combined in the same way as recited in the claim." Net MoneyIN, Inc., 2008 WL 4614511, at *10 (finding that the district court was wrong to combine parts of the separate protocols shown in the prior art reference in concluding that patent claim was anticipated).  On this basis, the '327 Chang lens does not , as a matter of law, clearly and convincingly anticipate the CIBA patents.

Inasmuch as the Court has determined that as a matter of law the '327 Chang did *not* anticipate the CIBA oxygen permeability and transmissibility limitations, the Court need not address the ophthalmic compatibility issue and CIBA's motion for summary judgment as to J&J's '327 Chang anticipation defense is **GRANTED**.

### c.   '579 Lai/Valint

Entitled "Wettable Silicone Hydrogel Compositions and Methods for their Manufacture," the '579 Lai/Valint Patent application was filed April 11, 1994.  (Doc. 154 (CIBA Ex. 15 (Patent No. 5,486,579 (issued Jan. 23, 1996)).)

CIBA argues that J&J's testing of a re-created '579 Lai/Valint lens demonstrated that the prior art had an oxygen transmissibility (Dk/t) of 54.0 and 58.4 barrers which is below the minimum of 70 barrers specified by the CIBA patents. (Doc. 152 (CIBA Ex. 4 ¶¶ 16, 17).)  As to ophthalmic compatibility, CIBA contends that the 2008 Bennan study of a re-created '579 Lai/Valint lens was conducted on seven patients for 21-22 hours, which in its expert's opinion, is not a sufficient basis to

establish ophthalmic compatibility.  (Doc. 153 (CIBA Ex. 8 ¶ 11).)  At oral argument, counsel for CIBA argued that J&J is asserting Example 4 of the '579 Lai/Valint lens and that the test results of that re-created example did not meet the CIBA specification.[16]  (Tr. 55.)  Because of the varied testing results, CIBA argues that "J&J's own testing establishes that the '579 Lai/Valint patent does not *necessarily* or *inevitability* yield a lens that meets the limitations of the CIBA patents."  (Doc. 151 at 36 (emphasis in original).)  See Schering Corp., 339 F.3d at 1378.

J&J cites to the "natural result flowing from the prior art disclosure" for inherent anticipation, see Schering Corp., 339 F.3d at 1379, contending that "the oxygen permeability of the '579 Lai/Valint lens at the proper thickness ranged from 70.8 to 77.6 barrers measured by the coulometric method," a range within the CIBA asserted claims' specification.  (Doc. 165 at 36-37.)  Furthermore, J&J measurements of thinner '579 Lai/Valint lenses revealed five of six lenses had oxygen permeability values of approximately 70 barrers or greater, and oxygen transmissibilities above 70 barrers.  (Id. at 37; Doc. 166-2 at 6 (J&J Ex. 59 ¶ 11).)  It is unclear whether the testing was upon the '579 Lai/Valint specific example J&J asserts anticipates the CIBA claims.

Each party cites to different testing results that support their respective

---

[16]     CIBA offers no citation for the basis of this assertion.  The '579 patent consolidates "Examples 1-6" breaking down their properties in a table.  (Doc. 154 (CIBA Ex. 15 ('579 Patent col.8 l.64-col.9 l.24).)

positions as to whether the '579 Lai/Valint patent meets the CIBA claims' oxygen permeability and transmissibility limitations.  The parties have not specified why one result should be ignored and the other embraced.  Because of lack of specificity by both parties as to the oxygen permeability and transmissibility of the '579 Lai/Valint lens, the factual issues of the adequacy of the Brennan Study for establishing ophthalmic compatibility, and the parties' failure to fully develop this issue, the Court finds that factual issues remain as to whether the '579 Lai/Valint lens anticipates the asserted CIBA claims.  CIBA's motion for summary judgment as to J&J's '579 Lai/Valint anticipation defense is **DENIED** without prejudice to the Court revisiting this issue at an appropriate time.

### d.     <u>Fluoroperm 92</u>

CIBA argues that the Fluoroperm 92 lens does not anticipate because it is a "commercial rigid gas permeable lens" as opposed to a silicone hydrogel lens. Further, CIBA argues that J&J's own testing establishes that the Fluoroperm 92 "does not meet the ion permeability limitations of any of the claims of the CIBA patents." (Doc. 151 at 39.)  According to CIBA, J&J's expert Valint reports that J&J found that the lowest Ionoflux permeability threshold level in the Fluoroperm 92 patent was 1.4 $\times 10^{-6}$ mm$^2$/min, as determined by the Ionoflux technique.  (<u>Id.</u> (citing Doc. 154 (CIBA Ex. 25 (J&J Expert Valint Claim Chart at 209)).)  CIBA notes that the lowest Ionoflux permeability threshold level in the CIBA asserted claims is 1.5 $\times 10^{-6}$ mm$^2$/min, thus

the Fluoroperm 92 does not meet the threshold requirement for the CIBA asserted patent claims.  (Id.)  The J&J scientist who performed the testing acknowledged that the Fluoroperm 92 "has very low ion permeability," and acknowledged that the Ionoflux method used was not exactly the method taught in the CIBA patent.  (Doc. 154 (CIBA Ex. 26 (Freeman dep. at 118-120)).)

J&J responds that a fact issue is created because the CIBA patent sets forth two methods of measurement of ion permeability having:

> an ion permeability characterized either by (1) an Ionoton Ion Permeability Coefficient of greater than about $0.2 \times 10^{-6} cm^2/sec$ *or* (2) an Ionoflux Diffusion Coefficient of greater than about $1.5 \times 10^{-6} mm^2/min$. wherein said ion permeability is measured with respect to sodium ions.

('100 Patent  cl.1 (emphasis added).)   J&J expert Dr. Freeman states that he "determined the Ionoton permeability coefficient of Fluoroperm 92, which has an Ionoton Ion Permeability of approximately 0.065 with the Second Ionoton Equation,"[17] which he says exceeds the claimed Ionoton values.  (Doc. 166-3 at 4-5 (J&J Ex. 60 ¶ 7).)  As to his results using the Ionoflux technique, Freeman contends his $1.4 \times 10^{-6} mm^2/min$ measurement "is well within the measurement error for the Ionoflux technique and is indistinguishable from the claimed limitation of $1.5 \times 10^{-6} mm^2/min$.," satisfying the lower of the Ionoflux coefficients recited in the CIBA patent claims.  (Id.

---

[17]    The CIBA patents provide two equations for Ionoton Ion Permeability Coefficient.  (See '100 Patent col.12, ll.17, 33-34.)

33

¶ 8).)

CIBA refutes J&J's contention that a prior art may be "nearly equivalent" to the teaching of the subject patent, citing the case <u>Richardson v. Suzuki Motor Co., Ltd.</u>, 868 F.2d 1226, 1236-37 (Fed. Cir. 1989)(error to instruct jury that anticipation may be shown by equivalents, a legal theory that is pertinent to obviousness under Section 103, not to anticipation under Section 102).  (Doc. 151 at 46.)

J&J's citation to a California District Court decision in support of its notion that its lower Ionoflux calculation is sufficient to satisfy  the claim term "greater than about $1.5 \times 10^{-6}$ mm$^2$/min" does not convince this Court that its measurement creates a question of fact.  In the California case, <u>Chiron Corp. v. SourceCF, Inc.</u>, No. C 05-01938 WHA, 2005 WL 3261263 (N.D. Cal. Dec. 1, 2005), the Court construed the term "about 60 to about 200 mg/ml" to mean "approximately," and said that "whether any particular concentration of tobramycin outside the range of exactly 60 to exactly 200 mg/ml, (such as 50 mg/ml), would infringe [the patent] is a question of fact that remains to be decided."  <u>Chiron Corp.</u>, 2005 WL 3261263, at *1, 4.  No such construction of "approximately" has occurred here.  Further, the CIBA claims set the threshold of the Ionoflux Diffusion Coefficient be "*greater* than about $1.5 \times 10^{-6}$ mm$^2$/min."  There is no dispute that 1) the Fluoroperm 92 is a *rigid* gas permeable lens, and 2) that its Ionoflux Diffusion Coefficient is *less* than the required "about $1.5 \times 10^{-6}$ mm$^2$/min." or greater.  CIBA motion for summary judgment as to whether the

34

Fluoroperm 92 anticipates the CIBA asserted claims is **GRANTED**.

### e.     Robertson

The "Robertson" prior art reference is a European Patent Application filed April 18, 1990, by CIBA-GEIGY AG.  (CIBA Ex. 19.)   The invention is described as a "wettable, flexible, oxygen permeable contact lens containing block copolymer polysiloxane-polyoxyalkylene backbone units." It discloses a silicone hydrogel contact lens "of a block copolymer containing polysiloxane and polyoxyalkylene oxide units possessing an advantageous blend of desirable properties including a) high oxygen permeability, b) good wettability, c) flexibility and d) optical clarity . . . ."  (CIBA Ex. 19 (Robertson Patent p.2 ll.2-4).)

CIBA argues that Robertson does not anticipate the CIBA asserted claims as a matter of law because 1) it contains no explicit disclosure of ophthalmic compatibility and J&J has made no re-creations of the Robertson lens to establish inherency; 2) the Robertson lens does not disclose oxygen permeability and transmissibility measured by the coulometric method specified by the CIBA patent and there is nothing to suggest that the Robertson values for oxygen permeability and transmissibility meets the limitations for those values in the CIBA patents; 3) there are no ion permeability values disclosed in the Robertson and J&J has not re-created the lens and made its own valuations, thus leaving no evidence establishing that the Robertson meets the CIBA limitations; and 4) the Robertson does not disclose any surface treatment.

(Doc. 151 (CIBA Mot. at 34-35).)

J&J responds that there are triable issues of fact as to each point raised by CIBA.  However, J&J has failed to establish how the Robertson meets the oxygen permeability and transmissibility limitations set forth in the asserted CIBA claims, using the same measurement methodology as the CIBA patents.  Comparing the Robertson oxygen permeability (Dk) value to that specified in the CIBA patents appears more like comparing apples and oranges; J&J provides no correlation between the measurements produced by the differing measurement methodologies. J&J's oxygen transmissibility (Dk/t) calculations suffer from the same flaw, as well as being based upon an assumption of the thickness of the lens.  Furthermore, J&J has not established that the Robertson lens meets the specific ion permeability specifications of the CIBA asserted claims.  The testimony proffered by J&J does not clearly and unequivocally disclose that Robertson anticipates the CIBA asserted patent claims as to ion permeability specifications.  CIBA's motion for summary judgment as to J&J's invalidity anticipation defense relating to the Robertson prior art is **GRANTED**.

### f.   **WO 9413717 to Sokolyuk**

The "Sokolyuk" is found in the record as an International Patent Application, No. WO 94/13717, dated December 4, 1992, entitled "A Method For The Production Of A Soft Contact Lens."  One of the inventors listed is Anatoliy Mihailovich Sokolyuk.

36

(CIBA Ex. 20.)

According to CIBA, Sokolyuk does not describe a silicone gel, but rather describes a conventional hydrogel lens with a high water content.  Thus, CIBA argues, it lacks the "combination of 'at least one oxyperm polyemerizable material' and 'at least one ionoperm polymerizable material.'" (CIBA Ex. 4 (Mays Decl. ¶ 20).) CIBA contends that these two materials are different and cannot be the same, citing to the wording of the CIBA asserted claims, which states that the CIBA lenses are comprised of

> said polymeric material being formed from polymerizable material*s* comprising:
> (a)   at least one oxyperm polymerizable material and
> (b)   at least one ionoperm polymerizable material, . . .

('100 Patent cl.1)(emphasis added), focusing on the plural "materials." (See also '894 Patent cl.1 (listing different groups of oxyperm polymerizable materials and ionoperm polymerizable materials).  Further, CIBA cites to the separate definition of the terms in support of them being two different materials. (CIBA Ex. 4 (Mays Decl. ¶ 24)(citing '100 Patent col.4 ll.40-50; col.5 ll.3-12.)  According to CIBA's expert, "[t]he present invention blends oxyperm material with the ionoperm materials of the conventional hydrogels to come up with a novel type of contact lens - a silicone hydrogel.  The specification is dedicated to teaching how these different types of materials - oxyperm and ionoperm materials - can be combined to make a successful extended wear lens." (CIBA Ex. 4 (Mays Decl. ¶ 25).)  By contrast, argues CIBA, "[t]he Sokolyuk

reference discloses conventional hydrogel lenses which, like other conventional hydrogels, have only one of these types of material, viz. an 'ionoperm polymerizable material.'  The Sokolyuk lenses do not contain 'oxyperm polymerizable material.'" (CIBA Ex. 4 (Mays Decl. ¶ 20).)  As a matter of law, concludes CIBA, "the oxyperm polymerizable material and the ionoperm polymerizable material cannot be the same material."  (Doc. 151 (CIBA Mot. at 36).)

J&J responds that in Sokolyuk, the entire hydrogel, composed primarily of polyacrylamide, is both an oxyperm polymerizable material and an ionoperm polymerizable material because the material is "polymerizable" and forms "a polymer displaying a relatively high oxygen diffusion rate therethrough" and a "relatively high ion diffusion rate therethrough."   J&J Ex. 61 (Valint Decl. ¶ 69); Doc. 165 (J&J's Response at 34).)  This assertion is based on its interpretation of the CIBA patent specification that states that "[o]xyperm polymerizable materials include a wide range of materials which may be polymerized to form a polymer displaying a relatively high oxygen diffusion rate therethrough."  ('100 Patent col.6 ll. 23-26.)  Thus, according to J&J, a material "need merely display 'a relatively high diffusion rate therethrough,'" which it says Sokolyuk does, in order to be an oxyperm polymerizable material.  It follows then, that Sokolyuk discloses an oxyperm polymerizable material. (J&J Ex. 61 (Valint Decl. ¶ 70).)  J&J cites to the Sokolyuk international patent   application which states: "It is common knowledge that in order to ensure the cornea normal function

38

conditions when wearing durable soft contact lenses, the latter must have high oxygen permeability; there also must be normal ion exchange between the biological tissue and the environment, which is characterized by the diffusion coefficient." (CIBA Ex. 20 (Sokolyuk application at 1-2).)

The Federal Circuit in Net MoneyIN, supra, reiterated that not only must a prior reference disclose each and every element of the claim of a claimed invention in order to anticipate, "the prior art reference [has] to show the claimed invention arranged or combined in the same way as recited in the claim in order to anticipate." Net MoneyIN, Inc., 2008 WL 4614511, at *10. Thus, to anticipate, the Sokolyuk must provide high oxygen permeability and high ion permeability in the same manner as does the asserted CIBA claims. The CIBA claims, as a matter of law, contemplate two different materials for "oxygen polymerizable material" and "ionoperm polymerizable material, material" forming separate "phases" or "co-continuous pathways." (See e.g. '100 Patent cls.1, 8, 11, 56.)  CIBA's motion for summary judgment as to J&J's invalidity anticipation defense relating to the Sokolyuk prior art is **GRANTED**.

### 3.   Invalidity for "Obviousness" (35 U.S.C. § 103(a))

A patent claim is invalid for obviousness

> if the differences between the subject matter sought to be
> patented and the prior art are such that the subject matter
> as a whole would have been obvious at the time the

> invention was made to a person having ordinary skill in the
> art . . . .

35 U.S.C. § 103(a).  "[The] combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." KSR Int'l Co. v. Teleflex, Inc., 550 U.S. 398, 127 S.Ct. 1727, 1739 (2007).  "[A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."  Id. at 1740.  CIBA moves for summary judgment on J&J's defense of invalidity based upon obviousness, contending that the CIBA asserted claims are nonobvious as a matter of law.

"While the ultimate question of patent validity is a question of law, the proper resolution of that ultimate question typically turns on underlying factual inquiries, including the scope and content of the prior art and the differences between the prior art and the claims at issue."  Commonwealth Scientific and Industrial Research Organisation v. Buffalo Technology (USA), Inc., 542 F.3d 1363, 1375 (Fed. Cir. 2008). "The factual determinations underpinning the legal conclusion of obviousness include 1) the scope and content of the prior art, 2) the level of ordinary skill in the art, 3) the differences between the claimed invention and the prior art, and 4) evidence of secondary factors, also known as objective indicia of non-obviousness."  Eisai Co. Ltd. v. Dr. Reddy's Labs., Inc., 533 F.3d 1353, 1356 (Fed. Cir. 2008)(when patent at issue claims a chemical compound, the obviousness inquiry often turns on structural similarities and differences between the claimed compound and the prior art

40

compound).  The obviousness inquiry must rely on evidence available at the time of the invention. <u>Eisai Co. Ltd.</u>, 533 F.3d at 1359.  However, the Court must be cautious to avoid the "'temptation to read into the prior art the teachings of the invention in issue.'" <u>KSR Int'l Co.</u>. 127 S.Ct.1742 (citation omitted).

"One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." <u>KSR Int'l. Co.</u>, 127 S.Ct. at 1742.  "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." <u>Id.</u>  "The level of skill in the art is important to obviousness analysis because a more skilled artisan will have more general knowledge on which to rely in combining teachings from multiple references." <u>In re Tzipori</u>, No. 2008-119, 2008 WL 4573007, at *6 (Fed. Cir. Oct. 15, 2008).  "In considering summary judgment [on the question of obviousness], the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact. <u>KSR Int'l Co.</u>, 127 S.Ct. at 1744.  Expert evidence may "'constitute independent evidence of nonobviousness.'" <u>Commonwealth Scientific and Industrial Research Organisation</u>, 542 F.3d at 1377 (citation omitted).

J&J asserts that a combination of the '100 Nandu, '461, '617 and '579 Lai Patents and prior references that disclose surface treatment of silicone and silicone

41

hydrogel contact lenses creates an ophthalmically compatible lens that meets the asserted claims of the CIBA patents, and thus renders the CIBA patents obvious. J&J expert Valint states:

> 97.   In my opinion, a person of ordinary skill in the art would have had a suggestion, teaching and/or motivation to combine references disclosing silicone hydrogel contact lenses (*e.g.,* '000 Nandu, '461, '671 and '579 Lai) formulations with references disclosing surface treatment of silicone and silicone hydrogel contact lenses in order to create an "ophthalmically compatible" lens. A person of ordinary skill in the art would also have a reasonable expectation of success. It would have been obvious that any person of skill in the art would want to create "ophthalmically compatible" lenses and that it would have been nothing more than routine skill to make a silicone hydrogel lens "ophthalmically compatible" by adding a surface treatment.

(Doc. 68 (Valint Decl. ¶ 97).)

CIBA contends that "it would not have been obvious to the skilled artisan in 1995 to combine the prior art silicone hydrogel formulations with the prior art surface treatments."  (Doc. 151 at 44.)  "J&J does not provide any analysis, however, of precisely how these pieces of prior art are supposed to render the CIBA claims obvious, alone or in combination with other references, or even identify other references that are alleged to be combined to render the claims obvious." (Id.) Thus, according to CIBA, J&J fails to meet the "articulated reasoning" requirement for obviousness enunciated by the Federal Circuit.  See Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1373 (Fed. Cir. 2008).  Further, CIBA argues that because J&J

has not done any clinical testing "on the so-called combination lenses to establish that the lenses meet [by clear and convincing evidence] the ophthalmic compatibility requirements of the CIBA patents," its obviousness defense fails for lack of proof as a matter of law.  (Doc. 151 at 45-46)(contending that J&J has done clinical testing on only the re-created '327 Chang and '579 Lai/Valint lenses, and on no combinations of prior art).)

The development of extended wear contact lenses is a highly competitive field. Noting that "prior attempts at producing a true extended wear contact lens have been unsuccessful," CIBA in its patent states that "there remains a need for an ophthalmically compatible, transparent polymeric material which is suited to extended periods of continuous contact with ocular tissue and tear fluid."  ('100 Patent col.2 ll.28-36.)  The parties do not dispute that in 1995, there was a motivation to combine prior art references to create a commercially successful extended wear soft contact lens.  Further, undisputed is the fact that the ordinary level of skill in the art is high; many of the experts and inventors have doctorate degrees.  Whether J&J can show by clear and convincing evidence that a skilled artisan would have had a reasonable expectation of success in combining the prior art silicone hydrogel formulations with the prior art surface treatments to produce a successful "ophthalmically compatible" silicone hydrogel extended-wear contact lens for continuous wear of at least 24 hours and up to 30 days patents is hotly disputed.  However, "the expectation of success

43

need only be reasonable, not absolute." Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1364 (Fed. Cir.), cert. denied, 128 S.Ct. 110 (2007).

J&J has proffered its expert's opinion that the prior art makes the CIBA claims obvious, (Doc. 68 (Valint Decl. ¶¶ 54-116); see also Doc. 166-4 at 33, 35-39 (CIBA Ex. 61 ¶¶ 80, 87-99)), and 220 pages of accompanying charts comparing claims of the CIBA patents side by side with prior art references, (Doc. 68 (Valint Decl. Ex. C).)[18]   While the actual expert declarations appear conclusory, the voluminous detailed chart does create a factual issue as to whether one skilled in the art would have combined the prior references to invent a lens meeting CIBA's ophthalmic compatibility claim terms.  CIBA itself notes that "that analysis . . . involves disputed facts and thus is not appropriate for summary judgment."  (Doc.151 at 45.)

That J&J has not done any clinical testing to combine prior references to demonstrate that combined lenses meet the ophthalmic compatibility requirements of the CIBA patents does not, as a matter of law, establish that the CIBA patents were not obvious in 1995, as CIBA argues. See KSR Int'l Co., 127 S.Ct. at 1737-38, 1341-46 (granting summary judgment of invalidity of patent based on obviousness though

_____

[18]     Expert Valint states that the voluminous chart sets forth "the differences between the claimed invention and the prior art, if any, as well as my opinion that it would have been obvious to a person or ordinary skill in the art to add any elements purportedly missing in any of the prior art references from another reference."  (Doc. 68 (Valint Decl. Ex. C).)

no clinical testing of combination of prior art);[19] <u>Frazier v. Layne Christensen Co.</u>, 239 Fed.Appx. 604 (Fed. Cir. 2007)(affirming judgment as a matter of law that patent was invalid as obvious based upon expert testimony).   Though CIBA relies upon expert declarations that the claim term "ophthalmic compatiblity" must be established by "clinical testing," the Court rejected CIBA's proposed limitation which would have required an "ophthalmically compatible" lens to meet the prescribed criteria "in a significant number of patients when worn over a substantial period of time." (Doc. 121 at 47-49.)

The permutations and calibrations of extended wear contact lenses are many and excruciatingly precise, with "'numerous parameters' to try." <u>Pfizer, Inc.</u>, 480 F.3d at 1366 (citation omitted).  However, given the broad scope of the CIBA patents, the large number of cited relevant prior art, the extensive expert testimony comparing each piece of prior art with the CIBA patents, <u>see</u> <u>KSR Int'l Co.</u>, 127 S.Ct. at 1745 (district court may take into account expert testimony "which may resolve or keep

---

[19]      In <u>KSR Int'l Co.</u>, summary judgment in favor of an obviousness defense was based upon the district court's "reviewing the pertinent history of pedal design, the scope of the [accusing] Engelgau patent, and the relevant prior art, . . . in light of the expert testimony and the parties' stipulations" concerning the level of ordinary skill in pedal design.  127 S.Ct. at 1737-38.  The Court held that "[t]he proper question to have asked was whether a pedal designer of ordinary skill, facing a wide range of needs created by developments in the field of endeavor, would have seen a benefit in upgrading [prior art] with a sensor."  <u>Id.</u> at 1744.  The accused was not required to assemble the prior art through "clinical testing" in order to establish obviousness.

open certain questions of fact"), and noting CIBA's own concern in 1995 about its competitors' developing an extended wear soft contact lens, there is sufficient evidence to create a triable issue of fact on the issue of obviousness.  CIBA's motion for summary judgment as to J&J's invalidity defense based upon obviousness is **DENIED**.

### 4.   Invalidity for "Best Mode" (35 U.S.C. § 112 ¶ 1)

CIBA seeks a summary judgment determination that J&J's defense of invalidity based upon "best mode" fails as a matter of law.  The best mode defense is based on 35 U.S.C. § 112 ¶ 1 which states:

> The specification shall contain a written description of the invention . . . , and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112 ¶ 1.  "Thus, paragraph 1 of § 112 requires a written description of the invention - a requirement separate and distinct from the enablement requirement." Carnegie Mellon Univ. v. Hoffmann-La Roche Inc., 541 F.3d 1115, 1121 (Fed. Cir. 2008).  The Federal Circuit has established a two-prong test for determining whether the inventor has met the "best mode" requirement:

> "[f]irst, the factfinder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention." Eli Lilly and Co. v. Barr Labs., Inc., 251 F.3d 955, 963 (Fed. Cir. 2001)[citation omitted]. This involves a subjective inquiry whereby the factfinder focuses on the inventor's state of mind at the time of filing. Id. "Second, if the inventor possessed a best mode, the

46

> factfinder must determine whether the written description disclosed the best mode such that one reasonably skilled in the art could practice it." <u>Id.</u> This involves an objective inquiry focused on the scope of the claimed invention and the level of skill in the art. <u>Id.</u>

<u>TALtech Ltd. v. Esquel Apparel, Inc.</u>, 279 Fed. Appx. 974, 977 (Fed. Cir. 2008); <u>see also</u> <u>Pfizer, Inc. v. Teva Pharms. USA, Inc.</u>, 518 F.3d 1353, 1364 (Fed. Cir. 2008). A claim may be invalid if the inventor fails to disclose in the specification the preferred use which he knows at the time of filing.

Though "[t]ypically the best mode issue concerns the applicant's failure to disclose a preferred embodiment, . . . the best mode requirement does not 'demand disclosure of every preference the inventor possesses as of the filing date.'" <u>Pfizer, Inc.</u>, 518 F.3d at 1364 (quoting <u>Bayer AG v. Schein Pharms., Inc.</u>, 301 F.3d 1306, 1314-15 (Fed. Cir. 2002)). Additionally, "best mode requires inventors 'to disclose aspects of making or using the claimed invention [when] the undisclosed matter materially affect[s] the properties of the claimed invention.'" <u>Pfizer, Inc.</u>, 518 F.3d at 1364 (quoting <u>Bayer AG</u>, 301 F.3d at 1319). "A finding of patent invalidity based on best mode 'requires clear and convincing evidence that the inventor both knew of and concealed a better mode of carrying out the claimed invention than that set forth in the specification.'" <u>Liquid Dynamics Corp. v. Vaughan Co.</u>, 449 F.3d 1209, 1223 (Fed. Cir. 2006). "'It is concealment of the best mode of practicing the claimed invention that section 112 para.1 is designed to prohibit.'" <u>Cardiac Pacemakers, Inc. v. St.</u>

47

Jude Medical, Inc., 381 F.3d 1371, 1378 (Fed. Cir. 2004)(quoting Randomex, Inc. v. Scopus Corp., 849 F.2d 585, 588 (Fed. Cir. 1988)).  "The best mode requirement differs from the enablement requirement, for failure to enable an invention will produce invalidity whether or not the omission was deliberate, whereas invalidity for omission of a better mode than was revealed requires knowledge of and concealment of that better mode."  Cardiac Pacemakers, Inc., 318 F.3d at 1378.

J&J argues that CIBA inventors subjectively knew of the best mode of practicing their invention but failed to disclose it in the patent application and that the application lacked sufficient disclosure to allow others to practice the best mode.  See Go Medical Inds. Pty., Ltd. v. Inmed Corp., 471 F.3d 1264, 1271 (Fed. Cir. 2006). Specifically, J&J contends that the CIBA patents fail to disclose the inventors' best or preferred mode of preparing the macromer used to make the Betacon 30 material. J&J contends that "many of the inventors . . . had a best mode of making the contact lens, designated as the 'Betacon 30' formulation, months before the filing date."  (Doc. 165 at 46-47 (citing  Doc. 166-26 at 18 (J&J Ex. 83 (SEE3 Program Quarterly Report XI, April 1, 1995-June 30, 1995 at CSFJ033820 quoting CIBA inventor Dr. Höpken as saying  "[a]t the SEE3 meeting in Coolum Betacon 30 Quad was chosen as the currently existing preferred material which showed unhindered on-eye mobility")).)[20]

---

[20]  According to CIBA inventor Dr. Nicolson, "Betacon 30 came into prominence, it was prepared well before the 4th quarter of '95 in Basel, Switzerland.  Jens Höpken was the chemist. . . who developed the material and had certainly done

CIBA disputes that the method characterized by J&J as the "best mode" for preparing the Betacon macromer was preferred by CIBA inventors at the time of the patent application in December 1995, and that the inventors "concealed" anything from the public. (Doc. 151 at 47.)  Further, CIBA contends that the documentation "confirm[s] unequivocally that Betacon 30 was not selected as the lead candidate material until December 18, 1995, *after* the filing of the patent application on December 8, 1995. (Id.)  Thus, according to CIBA, the first prong of the best mode analysis - that the inventors had a best mode for practicing the invention at the time the application is filed - is not satisfied.  (Id.)

According to declarations and documentation submitted by the parties, the crux of J&J's argument is that during the CIBA developmental SEE3 program, the CIBA inventors switched from preferring the "Alsacon New Coke" prototype lens for commercialization, which was removed from consideration in the second quarter of 1995, to the Betacon 30 as the leading candidate material for commercial development. That same spring of 1995, the SEE3 Program Quarterly Report cited by J&J states in its Executive Summary that:

> Early in this reporting period the difficult decision was reached to cease all work on ALSACON New Coke as the candidate core material for SEE3.  This decision was based on the observation of toxicity in lenses prepared late last

some measurements. . . ."  (Doc. 166-25 at 7 (J&J Exhibit 81 (Ga. Trial Transcript at 281).)

> year. . . . This is a setback, not a disaster.  The time cost is estimated to be 7 to 9 months.
>
> This decision has promoted a vigorous search for backup candidates.  Five potential candidates or candidate families have been identified including: BETACON 26 QA, GLYCON II 23  . . . , Minicon Plus and Minisilcon . . . and the PODIUM family . . . .  The BETACON and GLYCON entities have been demonstrated to move on the eye and meet all of the criteria (with PVP coating) while GLYCON also shows clinical movement with the Yasuda type plasma coating.  BETACON on the other hand shows mixed results with the Yasuda coating and is a subject to further investigation. . . .
>
> Minicon Plus and Minisilcon are pending evaluation in the clinic.  The PODIUM family continues to be explored.

(Doc. 166-26 at 3 (J&J Ex. 83 (SEE3 Program Quarterly Report XI, April 1, 1995-June 30, 1995 at CSF033805).)  Indeed, CIBA inventor Dr. Höpken noted in that same report that because of the oxygen permeability of the Betacon 30, "it was decided to develop an intermediate formulation with a higher $O_2Dk$ . . . .  We have prepared Betacon 26 QA . . . ."  (Id. at CSFJ033820.)  According to CIBA, three prototype materials - Betacon 30, Glycon II23, and Podium Db - were tested in extended wear clinical trials during the fourth quarter of 1995, the results of which were discussed at the December 15, 1995 SEE3 team meeting.  (Doc. 154 (CIBA Ex. 27D; Doc. 166-15 at 4 (J&J Ex. 72 (Nicolson dep. at 19)).)  The final decision was made, according to CIBA, on December 18, 1995 following the team meeting on December 15, *after* the December 8, 1995 filing of the CIBA '100 Patent application.  (Doc. 154 (CIBA Ex. 27

50

(Nicolson Decl. ¶¶4-7 & Ex. B)).)  Thus, in the SEE3 Program Quarterly Report for

October 1, 1995 through December 31, 1995, issued February 1, 1996, Dr. Nicolson

reported:

> This reporting period has been a most productive and most
> exciting one.  We have made a decision on our prime
> commercial candidate, BETACON 30. . . . Since the
> ALSACON abandonment decision, we have suffered a
> seven to nine month delay. . . .
>
> . . .
>
> •      BETACON 30 with a methane air plasma deposited
> surface has been selected as the commercial target for the
> SEE3 Program.  This decision was taken on December 18
> on the basis of a comprehensive review of three months of
> comparative clinical data among BETACON 30, GLYCON
> II23, and PODIUM Db.

(Doc. 166-27 at 3 (J&J Ex. 84 (SEE3 Program Quarterly Report XIII, October 1, 1995-

December 31, 1995 at CSFJ033528).)  "After December 18, 1995, the SEE3 team

focused its efforts on Betacon 30, which ultimately was developed into CIBA's

commercial Focus Night and Day contact lens product."  (Doc. 154 (CIBA Ex. 28

(Holden Decl. ¶ 5)).)

The '100 Patent lists nineteen inventors located all over the world.  That one of

those inventors (Dr. Höpken) stated in the spring of 1995 that he "currently" preferred

his particular product over the others does not establish that CIBA subjectively

possessed a best mode for practicing the invention at the time of filing its application.

The record does not present clear and convincing evidence that the CIBA inventors

51

both knew of and concealed a better mode of carrying out the claimed invention than that set forth in the specification.   To the contrary, the evidence indisputably establishes that one week *after* CIBA's submission of its patent application, the CIBA inventors concluded their testing and confirmed that the Betacon 30 was the preferred embodiment.  CIBA's motion for summary judgment as to J&J's invalidity  defense based upon "best mode" is **GRANTED**.

### 5.   Invalidity for "Indefiniteness" (35 U.S.C. § 112 ¶ 2)

Every patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  35 U.S.C. § 112, ¶ 2.  J&J seeks summary judgment on its defense that the CIBA patents are invalid as a matter of law for indefiniteness on three bases: functional claim terms; subjectivity; and conflicting definitions of ion permeability and its measurement.

"[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude."  Datamize, LLC. v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).  The Federal Circuit, in Datamize, advises the Court of the requirements of definiteness in patent claims.

> [T]he definiteness of claim terms depends on whether those
> terms can be given any reasonable meaning.  Furthermore,
> a difficult issue of claim construction does not *ipso facto*

> result in a holding of indefiniteness. [Citation omitted.] "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." [Citation omitted.] In this regard it is important to note that an issued patent is entitled to a statutory presumption of validity. *See* 35 U.S.C. § 282. "By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of validity and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal." [Citation omitted.] In this way we also follow the requirement that clear and convincing evidence be shown to invalidate a patent.

Datamize, LLC, 417 F.3d at 1347-48. The definiteness requirement does not require

absolute clarity; "[o]nly claims 'not amenable to construction' or 'insolubly ambiguous'

are indefinite." Id. at 1347.

In the face of an allegation of indefiniteness, general principles of claim

construction apply, which involve a review of intrinsic evidence and extrinsic evidence

such as expert testimony. Datamize, LLC, 417 F.3d at 1348; Exxon Research and

Engineering Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001). "The

definiteness inquiry focuses on whether those skilled in the art would understand the

scope of the claim when the claim is read in light of the rest of the specification."

Union Pacific Resources Co. v. Chesapeake Energy Corp., 236 F.3d 684, 692 (Fed.

Cir. 2001). Disagreement between the parties concerning the meaning of the claims

does not automatically render the claims so lacking in clarity as to be invalid for

53

indefiniteness.  Personalized Media Commc'ns, LLC v. Int'l Trade Commission, 161 F.3d 696, 705 (Fed. Cir. 1998).  Respecting the statutory presumption of patent validity, "'close questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee.'" Bancorp Services, L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1372 (Fed. Cir. 2004)(citation omitted).

Having carefully considered the applicable law and facts, the Court concludes that J&J is not entitled to summary judgment of invalidity based on indefiniteness. While there is case law that says that invalidity for indefiniteness is an issue of law, see e.g. All Dental Prodx, LLC and DMG v. Advantage Dental Products, Inc., 309 F.3d 774, 778 (Fed. Cir. 2002)("[a] determination that a patent claim is invalid for failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2 is 'a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims  [, and] therefore, like claim construction, is a question of law"), there are disputed factual issues here and both parties seem to assume that the resolution of these disputes will be for the jury.  Thus, at this juncture, the Court will simply **DENY** J&J's motion for summary judgment on its invalidity defense.

### 6.    Invalidity of Non-Asserted Claims

Pursuant to the parties' Stipulation Of Dismissal (Doc. 189), CIBA   has withdrawn its request for summary judgment on J&J's invalidity defenses as they apply to the non-asserted claims.  (Doc. 189 at 2.)

Upon due consideration and for the foregoing reasons, it is hereby

**ORDERED**:

1.    CIBA Vision Corporation's ("CIBA") Motion For Summary Judgment (Doc. 151) is **GRANTED IN PART AND DENIED IN PART** as follows:

a.    CIBA's motion for summary judgment as to infringement is **DENIED**;

b.    CIBA's motion for summary judgment as to J&J's defense of invalidity for lack of "enablement" is **DENIED**;

c.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the RD-677 Balafilcon A prior art is **GRANTED**;

d.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the '327 Chang prior art is **GRANTED**;

e.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the '579 Lai/Valint prior art is **DENIED** without prejudice;

f.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the Fluoroperm 92 prior art is **GRANTED**;

g.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the Robertson prior art is **GRANTED**;

h.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "anticipation" regarding the WO 9413717 Sokoluk prior art is **GRANTED**;

i.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "obviousness" is **DENIED**;

j.    CIBA's motion for summary judgment as to J&J's defense of invalidity for "best mode" is **GRANTED**;

k.    CIBA's motion for summary judgment as to J&J's defense of invalidity of Non-Asserted Claims is **WITHDRAWN** pursuant to stipulation of the parties.

2.    Johnson & Johnson Vision Care's ("J&J") Motion For Summary Judgment (Doc. 155) is **DENIED.**

3.    Inasmuch as the J&J expert submissions objected to by CIBA did not materially affect the Court's holdings on the motions for summary judgment, CIBA Vision Corporation's Motion To Strike New Expert Opinions Of Dr. William Benjamin (Doc. 158); CIBA Vision Corporation's Motion To Strike Opinion Testimony In Responsive Declaration Of Douglas G. Vanderlaan, PhD. (Doc. 171); and CIBA

56

Vision Corporation's Motion To Strike Portions Of The Responsive Declarations Of Johnson & Johnson Vision Care, Inc.'s Experts (Doc. 172) are all **DENIED**.

4.      There are several issues left open by this Order and perhaps one or two others that the Court will need to consider in advance of trial.  No later than **January 9, 2009**, each party, <u>after</u> consulting with the other to try to resolve them, may file a brief of no more than fifteen (15) pages addressing these issues.  No later than **January 20, 2009,** each party may file a responsive brief of no more than ten (10) pages.

5.      No later than **January 23, 2009**, the parties shall file a Joint Statement setting forth precisely the issues they intend to present to the jury in the trial set to begin on March 30, 2009.  It is time for both parties to narrow the issues to those they actually intend to try.

6.      This case is next set for a **Telephone Status Conference** on **January 29, 2009** at **3:30 p.m.** eastern time.[21]  (<u>See</u> Doc. 129 at 2.)

---

[21]      Counsel for Plaintiff Johnson & Johnson Vision Care, Inc. is directed to initiate the telephone conference call by calling counsel for the Defendant CIBA Vision Corp. and then calling the Court's polycom telephone line, (904) 549-1949. To maximize the quality of the audio-connection, counsel are requested not to use cell phones or speaker phones during the hearing.  **The call should be placed to the Court five minutes prior to the scheduled hearing time.**

57

**DONE AND ORDERED** at Jacksonville, Florida, this 3rd day of December, 2008.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record