**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

JOHNSON & JOHNSON
VISION CARE, INC.,

   Plaintiff and
   Counterclaim Defendant,

vs.                Case No. 3:05-cv-135-J-32TEM
                 Case No. 3:06-cv-301-J-32TEM

CIBA VISION CORPORATION,

   Defendant
   Counterclaim Plaintiff.

## ORDER

Before the Court is CIBA Vision Corporation's ("CIBA") Motion for Permanent Injunction (Doc. 319) which seeks to enjoin Johnson & Johnson Vision Care, Inc. ("J&J") from future sales of the contact lens product which the Court has found to be infringing, J&J's ACUVUE®OASYS. See Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., 648 F. Supp. 2d 1294 (M.D. Fla. 2009)[1] After receiving the parties' papers both in support of and opposition to the Motion for Permanent Injunction (Docs. 319, 320, 347, 364, S-75, S-80), and allowing discovery, the Court conducted a two day evidentiary hearing on March 22-23,

---

[1] The Court determined that J&J's ACUVUE®OASYS lens infringes CIBA's United States Patent Nos. 5,849,811 and 6,951,894, and does not infringe CIBA's United States Patent No. 5,760,100 ("Nicolson patents"). (Docs. 313, 330 at 11-13.)

1

2010, at which nine witnesses testified and the Court received one hundred fifteen exhibits in evidence. The entire record of the evidentiary hearing (Docs. 375, 376, 378, 379) and the parties' briefs are incorporated by reference.

In eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), the Supreme Court held that in patent cases, a plaintiff seeking a permanent injunction must satisfy the same four-factor test applicable to other requests for permanent injunctive relief:

> A [patent] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. at 391. The patent plaintiff bears the burden of proving its entitlement to a permanent injunction. See Voda v. Cordis Corp., 536 F.3d 1311, 1329 (Fed. Cir. 2008).

In many cases, and in this one, the issues of irreparable injury and the adequacy of monetary damages necessarily overlap. MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 569 n.11 (E. D. Va. 2007). While a number of irreparable harm arguments were made at the hearing, the Court focuses on the issue of licensing. J&J argues that CIBA's previous licensing of the Nicolson patents is evidence that it will suffer no irreparable harm if future sales of ACUVUE®OASYS are not enjoined, and that money damages are adequate to redress future harm. In analyzing this contention, the Court accepts CIBA's position that the mere fact that a patent holder has previously licensed the patent to one party does not create a bar to the patent holder seeking permanent injunctive relief against a different, infringing competitor. The Court also accepts CIBA's premise that some of CIBA's licensing

2

of the Nicolson patents occurred in the context of settling litigation and that this diminishes the significance of these licenses in the irreparable harm analysis. However, even granting both of these propositions, the Court still looks to the entire licensing history as relevant to whether CIBA will suffer future irreparable harm if an injunction does not issue.

In an instructive decision, <u>Acumed LLC v. Stryker Corp.</u>, 551 F.3d 1323 (Fed. Cir. 2008), the Federal Circuit affirmed the district court's grant of a permanent injunction following a jury finding of infringement. In so doing the Federal Circuit found that the district court did not abuse its discretion in finding irreparable injury notwithstanding that the plaintiff Acumed had previously licensed the subject patent. The Federal Circuit first found that:

> While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider. The fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement.

<u>Id</u>. at 1328. The Federal Circuit determined that, contrary to Stryker's argument that the district court had assigned no weight to the two licenses granted by Acumed, the district court had in fact considered the licenses, but simply did not find them to be persuasive to establish lack of irreparable injury. The Federal Circuit noted that:

> Absent clear error of judgment, which is not evident here, the weight accorded to the prior licenses falls squarely within the discretion of the court. A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed. [Citations omitted.] Adding a new competitor to the market may create an

3

>     irreparable harm that the prior licenses did not.

Id. at 1328-29. Notably, the Federal Circuit concluded in a footnote:

> We decline to consider whether it would be appropriate under other circumstances to deny injunctive relief because the patentee had licensed the patented technology to other competitors. We simply note that the district court did not abuse its discretion here when it considered the licenses granted by Acumed along with all the other relevant factors and ultimately concluded that Acumed would suffer irreparable harm from Stryker's continued infringement with no adequate remedy at law.

Id. at 1329 n.*.

Turning to this case, the facts adduced at the evidentiary hearing establish that CIBA has entered into four licenses of the Nicolson patents (which are due to expire in 2014), and previously offered a fifth license to J&J. (Tr. I at 140-41, 150 (Saia); JDEMO 90.)[2]

In 2002, before this litigation commenced, J&J and CIBA discussed the possibility of CIBA licensing the Nicolson patents to J&J. While initial license discussions mentioned a royalty rate of 8% (Tr. I at 131-33 (Saia); JX 301, 302), CIBA, in a December 20, 2002 e-mail, offered to give J&J a license to the Nicolson patents in return for a 15% royalty. (Tr. I at 132 (Saia); JX 60 ("[w]e are willing to grant you a license to the Nicolson patents at a 15% flat royalty rate. . . . In exchange, you will give us a license to your [J&J's] EW [extended wear] developments").) J&J declined CIBA's 15% royalty rate offer. (Tr. I at 132,

---

[2] The transcript of the evidentiary hearing held on CIBA's motion for a permanent injunction appears in the record at Documents 375-376. All references to the transcript volume and specific page will be cited as "(Tr. ___ at ___ (Witness).)". Hearing exhibits will be cited as "JX ___ at ___ " (plaintiff J&J's exhibits), "JDEMO ___ " (J&J demonstrative exhibits) and "DTX ___ at ___ " (defendant CIBA's exhibits). If the exhibit was filed under seal, this will be noted in a parenthetical.

4

175 (Saia); JX 302).)  According to Andrea Saia, CIBA president and chief executive officer, CIBA made the offer in 2002 for several reasons: CIBA "was in a capacity constraint situation for silicone hydrogel [contact lenses];" "we weren't quite certain what was going to happen with the overall silicone hydrogel segment;" and CIBA was interested "in helping accelerate the overall segment in our business."  (Tr. I at 99-100, 133, 138-39 (Saia); see also JX 303 ("[i]n 2002, there was uncertainty within CIBA Vision whether the new silicone hydrogel technology would ultimately become the dominant material class for contact lenses").)[3]

On July 1, 2004, CIBA licensed the Nicolson patents to competitor Bausch & Lomb ("B&L") in the context of a global litigation settlement.  (JX 19 (under seal); JDEMO 90; DTX 1484, 1575.)[4]  CIBA and B&L compete in the extended wear silicone hydrogel market; B&L markets its lens as PureVision.  (Tr. I at 142 (Saia).)  In reaching that licensing agreement, the parties considered a number of legal and business factors, including the outcome of pending litigation, size and trends of market segments with and without competitors, pricing assumptions, product cost assumptions, time and opportunity cost, and future generations of technologies.  (Tr. I at 149-53 (Saia); JX 184 (under seal).)  CIBA and B&L issued a joint press release announcing the global settlement of their patent litigation, which specifically referenced this license.  (JX 182.)

On November 19, 2007, also in the context of a patent litigation settlement, CIBA

---

[3] While CIBA contends that "things are different now" and that enjoining J&J's infringement is the only alternative that will prevent irreparable injury to CIBA, the Court is not persuaded.

[4] Because the parties are sensitive about disclosing the royalty rates in these licenses, the Court will omit them from this opinion.

licensed the Nicolson patents to domestic competitor CooperVision. (JX 20 (under seal); DTX 1485; JDEMO 90.) CooperVision is also a large competitor of CIBA, marketing its lenses under the name Biofinity. (Tr. I at 157 (Saia).)

On February 1, 2009, CIBA entered into two license agreements with two smaller companies, Menicon and Visco Vision. No litigation was involved in these licenses. Menicon approached CIBA about the license and "they had some intellectual property that [CIBA was] interested in as well." (Tr. I at 213 (Chyatte).) Menicon is the largest silicone hydrogel contact lens producer in Japan and has expressed an interest in the United States market. Menicon is also an important CIBA customer in Japan. (Tr. I at 160-61 (Saia); Tr. I at 213-14 (Chyatte); JX 21 (under seal); JDEMO 90.)

The 2009 Visco Vision license is a worldwide license. Though a small company, Visco Vision is the largest contact lens maker in Taiwan, and also sells its lenses through private labels (under other companies' brand names) in Europe, which would be permitted under its CIBA license. According to CIBA, it entered the license agreement because it is interested in expanding its position in Taiwan and also was concerned about enforcing its patents in Taiwan. And "[t]his is a company that we're very interested in learning the market from." (Tr. I at 140, 162-64 (Saia); Tr. I at 214, 219-26 (Chyatte); JX 155 JDEMO 90.)

This evidence demonstrates that CIBA either offered or actually entered into licensing agreements with its three major domestic competitors (including J&J itself) and also entered into licenses with two foreign manufacturers. While the licenses with the domestic competitors B&L and CooperVision occurred in the litigation context, the licenses with the

6

foreign manufacturers, at the same royalty rate, did not.[5] Moreover, the two foreign licenses were entered into recently, on February 1, 2009, shortly before this case went to trial. Thus, the factors cited in Acumed as pertinent to determining whether licensing history counsels for or against an irreparable harm finding, largely favor J&J's position. Acumed, 551 F.3d at 1328.

Looking at CIBA's licensing behavior and the specific facts of this case, the Court, as it did at the preliminary injunction stage (see Doc. 49 at 15), finds compelling that CIBA has been willing to share the Nicolson patents with so many of its competitors (again, including J&J itself). This conduct, taken in its totality, is inconsistent with CIBA's assertion that only enforcement of its right to exclude J&J from using the Nicolson patents will redress the harm that CIBA will suffer in the future on account of J&J's infringement. The Court finds that CIBA has failed to prove that it will be irreparably harmed if a permanent injunction does not enter or that monetary damages are inadequate to compensate CIBA for future injuries due to J&J's continued infringement.[6] See e.g. Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc., 579 F. Supp. 2d 554, 560 (D. Del. 2008), appeal dismissed, Nos. 2009-1014, 2009-1038, 2009 WL 4756149 (Fed. Cir. July 30, 2009)(patent owner's willingness to forego

---

[5] Three of the four license agreements contained cross-licenses, but one of them did not.

[6] The still evolving case law post-eBay discusses that, in a situation where a court is denying a permanent injunction to a prevailing patent plaintiff, the court may alternatively consider awarding "an ongoing royalty rate" to redress future harm to the plaintiff. While this issue was discussed at the permanent injunction hearing, CIBA said it has not yet determined whether to seek this alternative and asked the Court not to address it at this time in the event that the Court denied injunctive relief. The Court will honor CIBA's request.

7

its patent rights for compensation supports the court's conclusion that patent owner will not suffer irreparable harm absent an injunction; "[t]he fact that ACS [patent owner] was selective regarding its licensing compensation - exchanging its technology only for other licenses to competing technology - does not rectify the fact that ACS was willing, ultimately, to forego its exclusive rights for some manner of compensation"); see also MercExchange, 500 F. Supp. 2d at 577 ("decisions subsequent to the Supreme Court's opinion [in eBay] have rejected the broad classification that direct competitors always suffer irreparable harm from infringement"); Praxair, Inc. v. ATMI, Inc., 479 F. Supp. 2d 440, 444 (D. Del. 2007) (permanent injunction denied despite infringer being patentee's sole competitor).

Concerning the third e-Bay factor, for purposes of this Order, the Court will assume, without deciding, that the balance of hardships between CIBA and J&J dictates that injunctive relief is warranted.

The Court now addresses the public interest. CIBA relies upon the truism that the general public has an interest in enforcement of the patent laws. See e.g. Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006). While acknowledging that enjoining the future sales of ACUVUE®OASYS will cause some disruption to eye care practitioners and patients, CIBA seeks to minimize this concern by stating that it will entail "inconvenience" and no more. However, the persuasive evidence shows otherwise.

Sales of J&J's ACUVUE®OASYS lens began in the summer of 2005 and the product is now the largest single-selling contact lens in the United States market. It is undisputed that approximately 5.5 million American patients currently wear the ACUVUE®OASYS lens. ACUVUE®OASYS is the preferred choice for first fits among eye care practitioners. (Tr. I

at 83 (Saia); Tr. II at 18 (Brown)(71 percent of the time eye care professionals rated ACUVUE®OASYS as the best lens); Tr. II at 65 (Cohen); JX 55 at W128235.) According to J&J's expert witness, optometrist Dr. Stephen Cohen, the "Acuvue Oasys is by far the most comfortable lens I've ever fit" due to its edge design and wettablity, and "[c]omfort is often the determining factor about whether a patient is going to be able to wear contact lenses or not." (Tr. II at 53-54, 57 (Cohen).) Dr. Cohen testified that more than 1,000 of his patients are currently wearing the ACUVUE®OASYS lens. (Tr. II at 73 (Cohen).)

CIBA's expert optometrist and clinical professor Dr. Michael G. Harris opined that enjoining the sale of ACUVUE®OASYS lenses would not negatively affect public health or cause a substantial inconvenience for contact lens patients: "[T]he overwhelming majority of Acuvue Oasys lenses would be able to be refitted into another contact lens." However, Dr. Harris did acknowledge that the 5.5 million Oasys wearers would have to return to their eye care professional for a refitting when their current Oasys lens supply runs out or they are due for their annual prescription check up and renewal. This refitting takes 10 to 20 minutes, and the patient would then have to return to the eye care professional "for one, maybe two follow-up visits to make sure the patient has properly adapted to the [replacement] lens and that the lens is not adversely affecting the patient's eye." The follow-up visit would last 10 to 15 minutes, and the cost of the initial refitting plus the follow-up visits ranges between $50.00 and $125.00. (Tr. I at 281-83 (Harris).) J&J expert optometrist Cohen testified that his fee for a refitting is $110.00, and the refitting normally takes 15 minutes with one follow-up visit. (Tr. II at 55, 68 (Cohen).) And, according to Dr. Cohen, "since they'd be fitting these patients into products that don't work quite as well as Acuvue Oasys, it's conceivable

9

it may take more than two visits to obtain a satisfactory result." (Tr. II at 57 (Cohen).) Thus, even using Dr. Harris' estimates, the total cost of refitting for all current ACUVUE®OASYS users would be between $275 million and $687.5 million. (Tr. I at 308-10 (Harris).) Averaging that cost at $80.00 ("into the 80s") per refitting would result in a total cost "close to $500 million." (Tr. II at 21 (Brown).)[7]

Retired Bausch & Lomb executive (former vice president of global vision care) Angela Panzarella testified about the impact of a 2002 court injunction of the sale of B&L's PureVision contact lens, which affected 250,000 contact lens wearers and was not "an orderly process." (Tr. II at 96-100 (Panzarella).)

> . . . [F]or PureVision you had hundreds of thousands of patients who needed to find some substitute for their PureVision lens. And that meant they that needed to get into a practitioner's office before their supplies ran out.
>
> And as much as we'd like to think that that's orderly, that people all have yearly supplies and they come in for yearly exams, in reality, people don't come in on a yearly basis, they don't have yearly supplies. So patients have come in for a refit that they weren't expecting.

---

[7] CIBA in its examinations intimated that perhaps J&J could absorb the cost of the refitting. J&J's president of the Americas region Dave Brown responded that J&J could explore that possibility but noted that in addition to the expense, J&J would have to consider the legal and regulatory implications of paying eye care providers regarding prescriptions, and stated that J&J would not be willing to voluntarily pay for refitting fees for patients to be refit into lenses other than J&J contact lens products. (Tr. II at 21-22 (Brown); see also Tr. II at 121 (Panzarella) (regulations to anti-kick-back legislation sets some limitations regarding what kind of funding or incentives a company can give to doctors).) J&J expert Cohen testified that "[t]he costs primarily would be borne by the patients. But it's possible that the ECPs [eye care professionals] may choose to bear some or all of the costs. A small portion of it may be borne by insurance coverage." (Tr. II at 55-56 (Cohen).)

10

And I've heard some discussion in here about how a refit may take only ten minutes. But I think we've all had experience going to a doctor's office.

Ten minutes for the doctor means two hours for the consumer that they take out of their life, . . . missing work, sitting in a waiting room, sitting in an exam room, getting back and forth to work and so forth. . . .

For a consumer, that idea of an additional fitting fee is not a small thing. The inconvenience is not a small thing.

And because of that in the PureVision case, . . . there were a lot of consumers who tried to avoid a refit, and engaged in what was really risky behavior, behavior that's risky for their health. . . .

[S]ome of them tried to avoid the need for a refit and tried to stretch their lenses as long as possible, beyond the recommended one-month replacement period, which was the replacement recommendation for PureVision.

They tried to stretch them as long as possible, which is not good. It is not something that's recommended, because it does put your eyes at risk.

Some also tried to avoid having to go to a doctor's office at all by trying to find some substitute lense via the Internet . . . without a valid prescription.

And again, if you're switching lenses without a practitioner's supervision, you're putting your eyes at risk.

The last thing that we were dealing with was really significant confusion on the part of the consumers and the practitioners about what this injunction meant.

You have consumers who just heard that my lens isn't available. Is that because it's unhealthy? Is it because it's unsafe? Whose fault is it? And they tend to turn to their practitioners for those answers and blame the practitioner if their lens that they like is no longer available.

. . .

11

> . . . [A]bout $100 per refit, on an individual basis for the patient that is not a small sum, particularly if they've recently been fit in that lens in the first place and don't see any need from their standpoint to have a switch of the product.

(Tr. II at 97-100 (Panzarella). Panzarella testified that the cost of the PureVision injunction and resulting refitting "was borne by the consumers and the practitioners." (Id. at 100.) She compared the effect of the 2002 injunction on the sale of B&L's PureVision lenses to an injunction on J&J's ACUVUE®OASYS with its 5.5 million wearers as "a bit like comparing . . . the wake from a small boat to a tsunami." (Id.)[8]

This evidence convinces the Court that millions of innocent contact lens wearers will suffer real adverse consequences if sale of ACUVUE®OASYS is enjoined. These are not just issues of comfort or cosmetics, as CIBA argues, but rather deal with the more substantive concerns of proper vision and eye care. There will also be significant disruption, confusion and cost (estimated to be in the hundreds of millions of dollars) caused by

---

[8] CIBA's evidence attempting to minimize the public harm that would be caused by a permanent injunction of the sale of the ACUVUE®OASYS lens in the United States was not as persuasive. Netherlands optometrist Vincent Molkenboer testified that only 42 out his 500-600 contact lens wearing patients wore the ACUVUE®OASYS lens. He testified that "in most cases" his patients were able to find alternative lenses when a court in Holland enjoined the sale of ACUVUE®OASYS in that country. Thirty-five of the 42 ACUVUE®OASYS-wearing patients reverted to another J&J contact lens product, two patients purchased J&J ACUVUE®OASYS lenses over the internet from Belgium, and the remaining five patients changed to CIBA or CooperVision lenses; "[t]here was always an option." Additionally Dr. Molkenboer said his former Oasys patients are "fine" with their new lenses. (Tr. I at 270-73, 276 (Molkenboer).) CIBA also relies upon the deposition answers of J&J's Americas region president Brown that he did not believe that switching from the ACUVUE®OASYS lens would cause patients a health problem. However, under questioning from CIBA at the evidentiary hearing, Brown would not agree to the proposition that the removal of ACUVUE®OASYS from the market would cause no health problems for Oasys wearers. (Tr. I at 192-93 (Brown).)

ACUVUE®OASYS patients being abruptly told that the contact lens for which they have been fitted and with which they are satisfied, is no longer available.  Choosing a new lens will at minimum require refitting and the new lens may not prove as efficacious as the ACUVUE®OASYS lens.  Moreover, patients may have to be refitted more than once until an appropriate lens is found.  An undefined number will not be able to be refitted appropriately at all.  CIBA's answer that "they can just wear glasses" is no answer, in this Court's view.

The preponderance of the evidence convinces the Court that an injunction will create consequential medical, practical and economic issues for large numbers of ACUVUE®OASYS users.  The deleterious effects of the injunction on the general public would simply be too great to permit.  Thus, CIBA has failed to carry its burden of proving that the public interest would not disserved by the entry of a permanent injunction.

In reaching this decision, the Court applies the same rationale as the district court in Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., No. CV-03-0597-PHX-MHM, 2009 WL 920300 (D. Ariz. March 31, 2009), appeal dismissed, 346 F. App'x 580, 592 (Fed. Cir. 2009).  In considering whether to grant a permanent injunction following a jury verdict of infringement, the court in Bard spoke of the court's task "sitting in equity" to "weigh[ ] the utility of [the infringing] products against potential harm to public health, and in doing so, [to] focus on the practical consequences - for real patients and surgeons - of granting Plaintiffs' requested remedy."  Id. at *8:

> The court acknowledges that this is a difficult and relatively novel issue, in light of the eBay decision.  The Court is aware of the sentiments expressed by Plaintiffs' counsel at oral argument,

13

> that a willful infringer . . . should not be able to continue its future infringement unabated simply because it wrongfully acquired and then successfully reproduced a product of great public importance. [Footnote omitted.] Nor does the Court dispute the accuracy of Plaintiffs' argument that "[i]ntellectual property enjoys its highest value when asserted against a direct competitor in the plaintiff's market." [Citation omitted.] However, the values of the Patent Act and the protections that it offers to the patentee are sometimes outweighed by the Court's equitable concern for the greater public good . . . . The Court therefore declines to enjoin [the infringer] from continued production and sales of its [product], finding that Plaintiffs' remedy at law provides adequate compensation under the meaning of the Patent Act, particularly when viewed in light of the public interest served by [the infringer's] continued infringement . . . .

Id.

The Court understands that the product in Bard involved "potentially life saving technologies." Id. Here, the consequences of enjoining the ACUVUE®OASYS are not so grave; nevertheless, this Court, sitting in equity, finds those consequences to be sufficiently important and adverse to millions of ACUVUE®OASYS patients that the public interest would be disserved if an injunction were to be entered.

It is hereby

**ORDERED**:

1. CIBA's Motion for a Permanent Injunction (Doc. 319) is **DENIED**.

2. No later than **May 21, 2010**, the parties should either jointly or separately inform the Court of what further matters need to be addressed in this action at this time and provide a schedule for doing so. The parties should also propose a case management

schedule for the remaining patent cases between these parties pending in this Court.[9] If the parties disagree, they may each file a 10 page statement of their respective positions on these matters.

3. CIBA Vision Corporation's Motion In Limine To Exclude Declarations (Doc. 344) is **MOOT**; the declarations were not submitted or considered by the Court at the evidentiary hearing held on CIBA's Motion for a Permanent Injunction.[10]

4. CIBA Vision Corporation's Motion For Sanctions (Doc. 345) is **DENIED**.

5. CIBA Vision Corporation's Emergency Motion To Strike The Supplemental expert Report Of Dr. Stephen Cohen (Doc. 359) is **GRANTED**. (Tr. I at 28-29; Tr. II at 40.)

6. CooperVision, Inc.'s Motion To Intervene (Doc. 371) is **GRANTED** to the extent stated on the record. (Tr. I at 23-27.)

---

[9] Those cases are: Case Nos. 3:03-cv-800-J-32TEM, 3:04-cv-1297-J-32TEM, 3:06-cv-300-J-32TEM, 3:08-cv-1198-J-32MCR, and 3:09-cv-826-J-32JRK. Pending the Court's entry of scheduling orders in these cases, the parties are authorized to begin discovery in each of them.

[10] To the extent the Court deferred ruling on the admissibility of any other evidence at the evidentiary hearing, the Court finds these issues to be moot in light of this Order. The Court declines CIBA's request that the Court draw an adverse inference because of the "focus group" issue. Even if the Court were to have done so, it would not have changed the Court's ruling on the public interest issue.

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of April, 2010.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record